UNITED STATES of America,
Plaintiff–Appellee,

v.

Christopher McIVER, Defendant–
Appellant.

United States of America,
Plaintiff–Appellee,

v.

Brian Eberle, Defendant–Appellant.

Nos. 98–30145, 98–30146.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 2, 1999

Filed Aug. 6, 1999

Bruce Gobeo, Gobeo Law Offices, Missoula, Montana; Doreen Antenor, Bailey & Antenor Law Offices, Missoula, Montana, for the defendants-appellants.

Kris McLean, Assistant United States Attorney, Missoula, Montana, for the plaintiff-appellee.

Before: Arthur L. Alarcon, Pamela Ann Rymer, and Andrew J. Kleinfeld, Circuit Judges.

ALARCON, Circuit Judge:

Christopher McIver ("McIver") and Brian Eberle ("Eberle") appeal from the judgment entered following their conviction by a jury for conspiracy to manufacture marijuana in violation of 21 U.S.C. § 841(a)(1).

We must decide for the first time whether the placing by law enforcement officers of a magnetized electronic tracking device on the undercarriage of a vehicle is an unreasonable search and seizure.

McIver and Eberle contend that the district court erred in denying their motions to suppress evidence, in ruling on their objections to the admissibility of evidence, and in its instructions to the jury. They also argue that the evidence was insufficient to support their conviction, and that the district court erred in its sentencing decision.

We affirm because we conclude that the district court did not err in rejecting each of these contentions.

I

Factual Background

The evidence at trial viewed in the light most favorable to the Government revealed the following facts:

On or about July 8, 1997, United States Forest Service officers at the Kootenai National Forest became aware that six transplanted marijuana plants were being cultivated in a grow site in the Sunday Creek area. These plants were destroyed by members of the Northwest Drug Task Force because they did not have the resources to conduct a surveillance.

On July 30, 1997, Special Agent Lorney Jay Deist received a report from a United States Forest Service hydrologist that he had observed a marijuana plant growing in the same site in the Sunday Creek area. Special Agent Deist was the supervisor of ten Forest Service law enforcement officers assigned to the Kootenai National Forest.

On the same date, Special Agent Deist and Forest Service Law Enforcement Officer Joel Young accompanied the hydrologist to the Sunday Creek area. The officers found four marijuana plants. Special Agent Deist assumed from the quality of the plants that the person who was growing them had planted similar gardens in the immediate area. Special Agent Deist observed that the marijuana plants had been transplanted because the soil around them was not from that area. The area was tilled to receive the plants and had been amended with peat moss and fertilizer.

Special Agent Deist determined that because he had only ten law enforcement officers under his command, it would not be feasible to station them to conduct a surveillance of the site in order to learn the identity of the persons responsible for growing the plants. Instead, on August 1, 1997, he installed video and still cameras to photograph persons who approached the area where the plants were growing. The unmanned cameras were motion activated.

Among the vehicles photographed at the site was a white Toyota 4Runner truck. The Toyota 4Runner had unique pink spots on the side. On or about August 17, 1997, McIver was photographed near the marijuana plants accompanied by a person with dark hair. On September 12, 1997, McIver was photographed bending over the marijuana plants, and holding a camera near the plants. On September 18,

1997, Special Agent Deist observed a Toyota 4Runner that looked similar to one photographed by one of the Sunday Creek surveillance cameras. He followed the Toyota 4Runner to the Burlington Northern Roundhouse. The vehicle was parked in the employees' parking lot. When the driver stepped out of the vehicle, Special Agent Deist observed that he looked very similar to one of the persons captured on film at the Sunday Creek marijuana garden. Special Agent Deist traced the registration of the vehicle through law enforcement channels from its license plate. It was registered to Christopher McIver, whose residence was listed at 844 1st Avenue West, Kalispell, Montana. On September 19, 1997, a person wearing a long ponytail hair style was photographed near the marijuana plants.

After obtaining this information, Office Deist drove to McIver's residence. There, he observed a maroon Chevy Nova. By tracing its license number, he learned that it was registered to Brian Eberle, whose residence was listed as 844 1st Avenue West, Kalispell, Montana. An officer who had the residence under surveillance noted that Eberle wore a long ponytail, and that he drove the Chevy Nova.

During the last half of September, 1997, Special Agent Deist noticed that the buds on the marijuana plants in Sunday Creek had matured. He was aware from his prior training and experience that frost makes the THC substance in marijuana more active and "go to the bud." When that occurs, it is time to harvest the plant. Because the buds had matured, Special Agent Deist concluded that the marijuana plants at Sunday Creek would be harvested after September 23, 1997.

At 3:30 a.m. on September 23, 1997, Special Agent Deist and Officer Billy Stewart placed two magnetized tracking devices on the undercarriage of the Toyota 4Runner registered to McIver. One of the devices was a global positioning system. The other was a Birddog 300 electronic transmitter that sends a weak signal or a "beep" to an audio unit ("monitor") install-ed in the officer's vehicle. When the monitoring vehicle gets close to the transmitter, the signal received in the audio unit becomes stronger. The monitor also contains a 180 degree dial with a needle that points in the direction of the transmitter. When the tracking devices were placed on the Toyota 4Runner, it was parked in the driveway in front of McIver's garage, outside the curtilage of the residence.

The global positioning system malfunctioned after three days. Using the monitor, the officers tracked McIver from September 23, 1997 to October 2, 1997 as he traveled from his home to the Burlington Northern Roundhouse.

On October 2, 1997, United States Forest Service Law Enforcement Officer Keith Granrud observed the Toyota 4Runner leave the residence at approximately 8:40 p.m. Officer Granrud notified Special Agent Deist.

Special Agent Deist directed Officer Young to station himself near the intersection of Highway 93 and the Radnor Creek access road to the Sunday Creek area. Special Agent Deist then proceeded to Highway 93. Using the monitor, he located the Toyota 4Runner driving north on Highway 93 towards the Radnor Creek junction. At 9:30 p.m., Officer Young observed the Toyota 4Runner turn off on the Radnor Creek access road. Special Agent Deist and Officer Young drove north of the Radnor Creek turn-off to a location within a mile of the Sunday Creek site.

By monitoring the signal from the Birddog 300 electronic tracking device, the officers determined that the Toyota 4Runner was in the vicinity of the marijuana garden. The officers returned to the Radnor Creek turn-off for Highway 93.

The video surveillance cameras photographed two persons harvesting the marijuana plants and stuffing them into shiny plastic bags. At 10:30 p.m., the monitor received a new signal from the Birddog 300 electronic tracking device indicating that the Toyota 4Runner was moving. At

10:35 p.m., the officers observed the Toyota 4Runner turn onto Highway 93 and head south towards Kalispell.

Special Agent Deist directed Officer Young to check the marijuana plants to determine their present condition. Officer Young discovered that each of the plants had been pulled out from the ground or cut off near ground level. Special Agent Deist alerted Officer Stewart, who was on surveillance duty at the McIver/Eberle residence that the Toyota 4Runner appeared to be returning to that location.

From an alley opposite the McIver/Eberle residence, Officer Stewart observed the Toyota 4Runner drive up and park in front of the garage at 11:50 p.m. Officer Stewart observed that McIver was the driver and Eberle was his passenger. McIver and Eberle removed large plastic bags from the back of the Toyota 4Runner. The bags were bulky. Stems or rods protruded from the top. McIver and Eberle carried the bags into the house.

At approximately 12:30 a.m., the officers, led by Special Agent Deist, entered the McIver/Eberle residence without a warrant. Eberle and McIver were arrested. The officers conducted a protective sweep of the residence for weapons or cohorts of the arrestees. They observed in plain view cut marijuana and firearms in one bedroom, and a sophisticated grow operation in the basement—including 63 marijuana plants, potting soil, fans, heat lamps, and chemical sprays.

After the protective search, the house was sealed off until a search warrant could be obtained. A search warrant was executed at the McIver/Eberle residence at 1:00 p.m. on October 3, 1997. The officers seized the marijuana plants they had previously observed during the protective sweep of the house.

On the morning of October 3, 1997, several officers returned to the Sunday Creek site and removed what remained of the marijuana plants. This evidence was introduced at trial.

The Toyota 4Runner was impounded. On October 4, 1997, it was subjected to an inventory search. Evidence seized during the search and admitted at trial included a small quantity of marijuana leaves, a green bamboo plant stake, McIver's wallet, and a pair of sunglasses similar to those worn by McIver in several surveillance photographs.

A federal grand jury indicted McIver and Eberle on one count of conspiracy to manufacture marijuana, and one count of possession of marijuana with intent to distribute. During a pre-trial suppression hearing, the district court ruled that the warrantless entry of the McIver/Eberle residence violated the Fourth Amendment. The court suppressed the evidence observed following the entry, including the 63 marijuana plants seized from the basement the next day pursuant to the search warrant.

## II

### Discussion

We discuss each of the issues raised by McIver and Eberle, and the facts pertinent thereto, under separate headings.

### A. *Warrantless placement of unmanned surveillance cameras on national forest land*

■■■ McIver and Eberle contend that the district court erred in not granting their motion to suppress the photographs obtained by the Forest Service Officers through the use of unmanned still and video cameras without a warrant. We review *de novo* the lawfulness of a search and seizure. *See United States v. Hudson*, 100 F.3d 1409, 1414 (9th Cir.1996), *cert. denied*, —— U.S. ——, 118 S.Ct. 353, 139 L.Ed.2d 274 (1997). The trial court's underlying factual findings are reviewed for clear error. *See id.* Whether an individual has a reasonable expectation of privacy in an area that has been searched is a question of law we review *de novo*. *See United States v. Fultz*, 146 F.3d 1102, 1104 (9th Cir.1998).

The Supreme Court has instructed that:

The touchstone of Fourth Amendment analysis is whether a person has a "constitutionally protected reasonable expectation of privacy." *Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). *Katz* posits a two-part inquiry: first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?

*California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986).

■ McIver and Eberle maintain that the placement of unmanned cameras in a remote area of a national forest without a search warrant violated their reasonable expectation of privacy. They cite no authority that supports this novel proposition.

McIver and Eberle were on public land in a national forest when they cultivated their marijuana garden. Thus, they knowingly exposed their illegal activities to any person who visited that area. McIver and Eberle conceded that the observation of the marijuana plants by the Forest Service officers did not violate their Fourth Amendment rights. Clearly, the Forest Service officers had a right to carry out their law enforcement duties in each area of the Kootenai National Forest. It is also beyond dispute that the Forest Service could have stationed officers to conduct a 24–hour surveillance of the marijuana garden. *See Oliver v. United States,* 466 U.S. 170, 178, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) (holding that individuals "may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home").

McIver and Eberle argue that the use of an unmanned camera, as opposed to a camera operated by a Forest Service officer, constitutes an unreasonable search in violation of the Fourth Amendment. In *United States v. Knotts,* 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), the Court held that "[n]othing in the Fourth Amend-

ment prohibited the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afforded them." *Id.* at 282, 103 S.Ct. 1081. In *United States v. Dubrofsky,* 581 F.2d 208 (9th Cir.1978), we stated:

> Permissible techniques of surveillance include more than the five senses of officers and their unaided physical abilities. Binoculars, dogs that track and sniff out contraband, searchlights, fluorescent powders, automobiles and airplanes, burglar alarms, radar devices, and bait money contribute to surveillance without violation of the Fourth Amendment in the usual case.

*Id.* at 211. We reject the notion that the visual observation of the site became unconstitutional merely because law enforcement chose to use a more cost-effective "mechanical eye" to continue the surveillance. *See Knotts,* 460 U.S. at 284, 103 S.Ct. 1081 ("Insofar as respondent's complaint appears to be simply that scientific devices such as the beeper enabled the police to be more effective in detecting crime, it simply has no constitutional foundation. We have never equated police efficiency with unconstitutionality, and we decline to do so now."). We conclude that while McIver and Eberle may have anticipated that cultivating marijuana in a remote area of a national forest would not be observed by law enforcement officers, they have failed to demonstrate that they had an objectively reasonable expectation of privacy in their cultivation of marijuana in an area open to the public. We are also persuaded that the use of photographic equipment to gather evidence that could be lawfully observed by a law enforcement officer does not violate the Fourth Amendment. The use of a motion activated camera under these circumstances appears to us to be a prudent and efficient use of modern technology.

■ Our holding on this issue is quite narrow. Illegal activities conducted on government land open to the public which

may be viewed by any passing visitor or law enforcement officer are not protected by the Fourth Amendment because there can be no reasonable expectation of privacy under such circumstances. We are mindful that a person can have a reasonable expectation of privacy in a hotel room, a cabin, or an enclosed tent on public lands. *See, e.g., United States v. Gooch,* 6 F.3d 673, 677 (9th Cir.1993) (holding that a person has a reasonable expectation of privacy in a tent pitched in a public campground). In *Katz v. United States,* 389 U.S. 347, 351–52, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Supreme Court explained that what a citizen "seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." Here, McIver and Eberle did not conceal their marijuana garden. As they have conceded, other persons visited the same area and were photographed by the motion activated cameras.

### B. *Legality of the warrantless placement of the electronic tracking devices on the Toyota 4Runner*

McIver argues that the act of placing the electronic tracking devices on the undercarriage of the Toyota 4Runner constituted an unreasonable search and seizure. He does not contend that the officers infringed his Fourth Amendment rights by monitoring the beeper as the Toyota 4Runner traveled on the streets and highways. He forthrightly cites *United States v. Knotts,* 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), for the proposition that there is no reasonable expectation of privacy while on a public thoroughfare. Instead, he asserts that the district court erred in denying his motion to suppress "all evidence gathered as a result of the tracking devices."

■ McIver first maintains that a search warrant was required because the officers committed a trespass by placing the electronic tracking devices on the undercarriage of the Toyota 4Runner while it was parked in his driveway. McIver concedes that the Toyota 4Runner was outside the curtilage. The record shows that the

driveway and the apron in front of the garage were open to observation from persons passing by. The driveway was not enclosed by a fence and a gate.

In *Oliver,* the Court stated that "only the curtilage, not the neighboring open fields, warrants the Fourth Amendment protections that attach to the home." 466 U.S. at 180, 104 S.Ct. 1735. The court also opined that "[t]he law of trespass, however, forbids intrusions upon land that the Fourth Amendment would not proscribe. For trespass law extends to instances where the exercise of the right to exclude vindicates no legitimate privacy interest." *Id.* at 183, 104 S.Ct. 1735. Assuming *arguendo* that the officers committed a trespass in walking into McIver's open driveway, he has failed to demonstrate that he had a legitimate expectation of privacy cognizable under the Fourth Amendment in this portion of his property.

■ Secondly, McIver contends that the mere placement of the electronic tracking devices on the undercarriage of the Toyota 4Runner was an illegal search *and* seizure. "We must first determine whether this can be considered a 'search' subject to the Fourth Amendment—did it infringe an expectation of privacy that society is prepared to consider reasonable?" *United States v. Jacobsen,* 466 U.S. 109, 122, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). In *New York v. Class,* 475 U.S. 106, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986), the Court held that there is no reasonable expectation of privacy in the exterior of a car because "[t]he exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a 'search'." *Id.* at 114, 106 S.Ct. 960 (citing *Cardwell v. Lewis,* 417 U.S. 583, 588–89, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974)). In *Class,* the officer's conduct in opening the door of the respondent's car to move papers that obscured the vehicle's identification number ("VIN") located on the dashboard was held not to violate the Fourth Amendment. *See id.* at 107, 106 S.Ct. 960. The court reasoned that "[t]he VIN's mandat-

ed visibility makes it more similar to the exterior of the car than to the trunk or glove compartment." *Id.* at 114, 106 S.Ct. 960. Relying in part on the Supreme Court's opinion in *Class,* the Tenth Circuit held in *United States v. Rascon–Ortiz,* 994 F.2d 749 (10th Cir.1993), that "[t]he undercarriage· is part of the car's exterior, and as such, is not afforded a reasonable expectation of privacy." *Id.* at 754. In *Rascon–Ortiz,* an officer "knelt down and looked under the car with a flashlight." *Id.* at 750. Here, rather than making a visual inspection of the undercarriage of the Toyota 4Runner, the officers placed the magnetized electronic devices on the vehicle's undercarriage. In determining whether the officer's conduct was a search, we must decide whether McIver has demonstrated that he intended to preserve the undercarriage of the Toyota 4Runner as private—free from warrantless governmental intrusion. McIver did not produce any evidence to show that he intended to shield the undercarriage of his Toyota 4Runner from inspection by others. Furthermore, in placing the electronic devices on the undercarriage of the Toyota 4Runner, the officers did not pry into a hidden or enclosed area.

At oral argument, McIver argued that the placing of the electronic devices on the undercarriage of the Toyota 4Runner was a seizure of the vehicle. This argument ignores the principle articulated by the Supreme Court in *United States v. Karo,* 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984). There, the Court wrote:

> A "seizure" of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." [citing *Jacobsen,* 466 U.S. at 113, 104 S.Ct. 1652]. Although the can may have contained an unknown and unwanted foreign object, it cannot be said that anyone's possessory interest was interfered with in a meaningful way. At most, there was a technical trespass on the space occupied by the beeper. The existence of a physical trespass is only marginally relevant to the question of whether the Fourth Amendment has been violated, however, for an actual trespass is neither necessary nor sufficient to establish a constitutional violation.

*Id.* at 712–13, 104 S.Ct. 3296.

McIver did not present any evidence that the placement of the magnetized tracking devices deprived him of dominion and control of his Toyota 4Runner, nor did he demonstrate that the presence of these objects caused any damage to the electronic components of the vehicle. Under these circumstances, we hold that no seizure occurred because the officers did not meaningfully interfere with McIver's possessory interest in the Toyota 4Runner.

## C. Admissibility of evidence seized from McIver's Toyota 4Runner

Prior to trial, McIver and Eberle moved to suppress all evidence found in their house by law enforcement. The district court ruled that the warrantless entry into the house at 12:30 a.m. on October 3, 1997 was not justified by exigent circumstances, and was therefore unlawful. The district court applied the "fruit of the poisonous tree" doctrine and ruled that the evidence seized in the house pursuant to a search warrant on the afternoon of October 3, 1997 was inadmissible to prove guilt. The Toyota 4Runner was also seized pursuant to the search warrant. It was towed to a Forest Service impound lot. On October 4, 1997, it was subjected to an inventory search. The officers seized a pair of Oakley sunglasses that were on the dashboard, green leafy material from the passenger seat, a green bamboo plant stake, and a wallet containing McIver's driver's license.

Prior to jury selection, the Government informed the court that it intended to offer the evidence seized from the Toyota 4Runner. Defense counsel objected on the ground that the evidence seized from the Toyota 4Runner was the "fruit of the poisonous tree."

After reviewing the affidavit and the application for the search warrant, the court denied the motion to suppress the evidence seized from the Toyota 4Runner. The court reasoned that after excluding all facts alleged in the affidavit and the application that were gained from the warrantless entry into the residence, sufficient circumstances were alleged based on the information gathered prior to the entry to establish probable cause to issue the warrant for the seizure of the truck.

■ Before this court, McIver maintained that the district court erred in admitting the evidence seized from the Toyota 4Runner because it was the fruit of an illegal search of the house conducted prior to the issuance of the search warrant. We review *de novo* a district court's determination that probable cause existed for the issuance of a search warrant. *See United States v. Hernandez*, 80 F.3d 1253, 1258 (9th Cir.1996).

■ We have examined the affidavit in support of the search warrant. It contains sufficient facts independent of those obtained from the officers' observations after their entry into the house to demonstrate probable cause for the search of the Toyota 4Runner.

Special Agent Deist's affidavit contained the following facts: A hydrology crew discovered what they believed to be a marijuana plant in the Sunday Creek drainage in the Kootenai Forest. The hydrologists removed a leaf from the plant. They reported their observation to Forest Service law enforcement officers. The leaf was tested. It was marijuana. Forest Service law enforcement officers went to the site with the hydrologists on July 30, 1997. They found three additional plants.

Motion activated surveillance cameras installed at the site showed that a white Toyota 4Runner was at the Sunday Creek site on August 17, 1997 and September 12, 1997. On September 18, 1997, Special Agent Deist observed the same vehicle on U.S. Highway 93. Special Agent Deist followed the vehicle to a Burlington Northern parking lot. The driver was the same person depicted in the photographs taken at the Sunday Creek site. A check of the vehicle's registration based on the license plate number disclosed that McIver was listed as the owner and that he resided at 844 1st Ave. West, Kalispell, Montana. Special Agent Deist also determined that McIver was employed by Burlington Northern and was currently working in the Sunday Creek area.

On September 22, 1997, a Birddog 300 electronic tracking device was placed on the Toyota 4Runner. On October 2, 1997, a surveillance officer observed the Toyota 4Runner leave the McIver/Eberle residence and proceed north. Special Agent Deist followed the vehicle to the turnoff on Radnor Road to the Sunday Creek area.

Special Agent Deist followed the Toyota 4Runner when it returned to Highway 93. Meanwhile, Officer Young inspected the Sunday creek site and observed that two of the marijuana plants had been harvested. The same officer had seen the plants untouched that same morning.

Officer Stewart observed the Toyota 4Runner return to the McIver/Eberle residence at 11:50 p.m. Using night vision equipment, he observed McIver and Eberle remove two large plastic bags from the back of the vehicle. The bags were full and contained plant stems.

These facts amply demonstrate that probable cause existed to believe that the Toyota 4Runner was used to transport marijuana plants and that it might contain evidence of a crime. The district court did not err in denying the motion to suppress the evidence found in the Toyota 4Runner.

D. *Admission of the photographs and videotapes into evidence*

Eberle asserts that the district court erred in admitting the videotapes and still photographs because they were not properly authenticated or identified as required by Rule 901(a) of the Federal Rules of Evidence. The record shows that Eberle's counsel informed the court that there

would be no objection to the photographs marked as Exhibits 4 through 25.

Officer David Helmrick installed the cameras at the Sunday Creek site. His testimony was offered to lay the foundation for the admission of the still photographs and the pictures on the videotapes. He testified that Exhibit 26 was an edited video tape containing all the activity around the marijuana plants and the adjacent parking area captured by the video surveillance cameras. It was referred to at trial as a "summary tape." Eberle objected to the admission of Exhibit 26 pursuant to Rule 1002 and Rule 1006 of the Federal Rules of Evidence. No objection was made prior to the admission of Exhibit 26 that the edited videotape had not been properly authenticated or identified pursuant to Rule 901(a).

Rule 103(a) precludes an attack on the admission of evidence unless a timely objection is made stating the specific ground of the objection. *See* Fed.R.Evid. 103(a). We may, however, consider a plain error in the absence of an objection if the erroneous admission of the evidence affected a defendant's substantial rights. *See* Fed. R.Crim.P. 52(b).

■ The record shows Eberle objected to Officer Helmrick's testimony that Exhibit 26 depicted Eberle at the Sunday Creek site pursuant to Rule 901(a). The court sustained the objection immediately and instructed the jury that they would determine what was depicted on Exhibit 26. Eberle has failed to demonstrate that the alleged error was prejudicial in that it affected the outcome of the trial. *See United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

E. *Sufficiency of the evidence*

■ McIver and Eberle argue that the evidence presented at trial was insufficient to establish that they were guilty beyond a reasonable doubt of the offense of conspiring to manufacture marijuana. There is sufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See United States v. Nelson*, 137 F.3d 1094, 1103 (9th Cir.1998).

■ The record contains sufficient evidence to persuade a rational trier of fact that Eberle conspired with McIver to manufacture marijuana. In addition to the photograph of Eberle contained in Exhibit 26, he was in the Toyota 4Runner when it returned from the Sunday Creek area after the marijuana plants had been harvested. He was also observed carrying a large, bulky garbage bag containing stems or rods. Marijuana leaves were found in the Toyota 4Runner the next day.

McIver argues that the photographs which depict him bending over a marijuana plant, taking a photograph of the marijuana plants, and show his Toyota 4Runner in the parking area are insufficient to show beyond a reasonable doubt that he conspired to manufacture marijuana in a national forest. We are persuaded from our review of the record that the circumstantial evidence produced by the Government was sufficient to persuade a rational trier of fact that McIver is guilty of conspiracy to manufacture marijuana. The Government's case was not based solely on the photographic exhibits. The evidence when reviewed as a whole, including the facts that McIver drove to the Sunday Creek area on the same night that the marijuana plants were harvested, and returned carrying bulky garbage bags containing stems or rods, satisfies the reasonable doubt standard.

F. *Propriety of the supplemental jury instruction on the definition of "manufacturing"*

■ McIver and Eberle contend that the trial court erred by giving a supplemental jury instruction after the Rule 30 conference and after closing arguments were given. . Rule 30 provides that:

At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file

written requests that the court instruct the jury on the law as set forth in the requests.... The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury.

Fed.R.Crim.P. 30.

■ McIver argues that this error "seriously impaired the effectiveness of [his] closing argument." We review a trial court's decision to give a supplemental jury instruction for an abuse of discretion. *See United States v. Solomon,* 825 F.2d 1292, 1295 (9th Cir.1987). However, where the party fails to object at trial or fails to state distinctly the grounds for the objection, we review only for plain error. *See United States v. Dorri,* 15 F.3d 888, 891 (9th Cir.1994).

On the second day of trial, the court conducted a Rule 30 hearing on jury instructions. After the close of evidence, the court heard McIver and Eberle's motion for a judgment of acquittal on Counts I and II. The court granted the motion with respect to Count II (possession of marijuana with intent to distribute). As a result, the jury instructions were revised, with the concurrence of counsel. Neither side proposed an instruction on the definition of "manufacture," although the charge to the jury stated that "the defendants are charged in the indictment ... with conspiracy to manufacture marijuana." During his closing argument, counsel for McIver made eleven references to the fact that there was no evidence of "manufacturing" marijuana. During deliberations, three jurors sent a note to the judge asking, "What is manufacturing?" The judge conferred with counsel for both sides and decided to provide the jury with a supplemental instruction consisting of the definitions of "manufacture" and "production" contained in the statute under which the defendants were charged. *See* 21 U.S.C. § 802(15) & (22). McIver and Eberle objected on the ground that the instruction would be "confusing to the jury," and stated that "the jury should be allowed to determine on their own what they believe

'manufacturing' is." The court overruled the objection. The jury was instructed as follows:

> The term "manufacture" means the production, preparation, propagation, compounding, or processing of a drug or other substance, either directly or indirectly or by extraction from substances of natural origin, or independently by means of chemical synthesis, and includes any packaging or repackaging of such substance or labeling or relabeling of its container. The term "production" includes the manufacture, planting, cultivation, growing, or harvesting of a controlled substance.

The first sentence is taken verbatim from 21 U.S.C. § 802(15) and the second from 21 U.S.C. § 802(22).

■ Under the law of this circuit, "[t]he necessity, extent and character of additional instructions are matters within the sound discretion of the trial court." *United States v. Collom,* 614 F.2d 624, 631 (9th Cir.1979) (citations omitted). However, the district court has an obligation, when a jury requests clarification on an issue, to "clear away the confusion 'with concrete accuracy.'" *United States v. McCall,* 592 F.2d 1066, 1068 (9th Cir.1979) (quoting *Bollenbach v. United States,* 326 U.S. 607, 612–13, 66 S.Ct. 402, 90 L.Ed. 350 (1946)). By asking "what is manufacturing?" the jury clearly indicated its confusion on this issue. The district court correctly decided that the jury instructions were inadequate without a definition of manufacturing. Rather than "confusing the jury" by giving the instruction, as McIver and Eberle contend, the district court judge was eliminating confusion, as required by *McCall. See id.*

■ McIver and Eberle also contend, for the first time on appeal, that the effectiveness of McIver's closing argument was seriously impaired by the supplemental instruction defining "manufacturing." Specifically, they claim that "[h]ad counsel known that that instruction was going to be given, he would not have stressed the

use of the word 'manufacture' in closing with the jury." However, because McIver did not specifically state this ground for his objection before the district court, we review this contention for plain error. *See Dorri*, 15 F.3d at 891(citing Fed.R.Crim.P. 30). "Plain error" is error that is clear under existing law and affects a defendant's substantial rights. *See Olano*, 507 U.S. at 734, 113 S.Ct. 1770. The district court did not commit plain error because the supplemental instruction consisted of a correct statement of law. The court merely defined a term used in the original charge to the jury, and the instruction was essential to clear up the jury's confusion.

G. *Admissibility of evidence suppressed at trial in calculating the Sentencing Guideline range*

▮▮▮▮ McIver and Eberle challenge the denial of their motion to exclude from consideration as relevant conduct evidence that was seized in violation of the Fourth Amendment. We review *de novo* a district court's interpretation of the Sentencing Guidelines. *See United States v. Garcia*, 135 F.3d 667, 669 (9th Cir.1998). A court's factual findings are reviewed for clear error. *See United States v. Reed*, 80 F.3d 1419, 1421 (9th Cir.1996).

In opposing McIver and Eberle's motion to exclude the 63 marijuana plants found in their basement from consideration as relevant conduct, the Government contended that under *United States v. Kim*, 25 F.3d 1426 (9th Cir.1994), a district court must determine the subjective intent of the officers in seizing evidence in violation of the Fourth Amendment in deciding whether the evidence can be considered as relevant conduct for calculation of the Sentencing Guideline range under United States Sentencing Guidelines § 1B1.3.[1] The prosecutor argued that the facts demonstrated that the officers were surprised to find the "grow operation" in the McIver/Eberle basement. He argued further their intent was to seize the marijuana plants harvested in the Sunday Creek area, and that the plants in the basement were discovered during a protective sweep of the residence. The prosecutor requested the court to find that the discovery of the plants in the basement was "much more by chance than by design."

The court denied the motion to exclude the evidence under the relevant conduct provisions of U.S.S.G. § 1B1.3, but was unclear as to the basis of its decision.

Prior to the adoption of the Sentencing Guidelines, courts generally allowed illegally seized evidence to be considered by the sentencing judge. *See, e.g., United States v. Lee*, 540 F.2d 1205, 1210–1211 (4th Cir.1976); *United States v. Schipani*, 435 F.2d 26, 28 (2d Cir.1970). In 1968, we created an exception to the general rule in

---

1. U.S.S.G. § 1B1.3(a) provides in pertinent part as follows:

(a) *Chapters Two (Offense Conduct) and Three (Adjustments)*. Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

(1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts

and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

(4) any other information specified in the applicable guideline.

*Verdugo v. United States,* 402 F.2d 599 (9th Cir.1968). We held in *Verdugo* that "where, as here, the use of illegally seized evidence would provide a substantial incentive for unconstitutional searches and seizures, that evidence should be disregarded by the sentencing judge." *Id.* at 613. We reasoned that because at the time of the illegal search, "the agents already had in their possession sufficient evidence to convict Verdugo of the [earlier] transaction," *id.* at 612, allowing the use of the illegally seized evidence at sentencing would provide the "substantial incentive" in this case. Specifically, we stated that "[u]nless the evidence were unavailable for sentence as well as conviction, the agents had nothing to lose by risking an unlawful search: If the motion to suppress were denied, Verdugo could be convicted of an additional offense; if it were granted, the sentence on the original charge could still be enhanced." *Id.*

In *Kim,* we described the exception created by *Verdugo* as an "objective inquiry" into whether, under the circumstances, the officers had "an undue incentive to act" in violation of the Fourth Amendment. 25 F.3d at 1435 & n. 9. We noted that other circuits have articulated a more limited "subjective test." *See id.* Under this test, illegally seized evidence will be excluded at sentencing only where the defendant can show that "officers obtained evidence expressly to enhance a sentence." *United States v. Tejada,* 956 F.2d 1256, 1263 (2d Cir.1992).

In *Kim,* we held that the Sentencing Guidelines implemented in 1987 require the use of all relevant conduct, including evidence suppressed at trial, for purposes of calculating the offense level under U.S.S.G. § 1B1.3. *See* 25 F.3d at 1432–34. We reserved the issue of whether an exception to this rule still applies, and whether *Verdugo*'s "objective inquiry" or the "subjective" test of other circuits should be used, because the facts of *Kim* did not fall within either formulation of the exception. *See id.* at 1434 n. 8, 1435 n. 9.

■ A review of the facts of this case demonstrates that the district court did not clearly err in ruling that the 63 marijuana plants, which had been suppressed at trial, could be considered for sentencing purposes. McIver and Eberle failed to demonstrate that the officers "obtained [the] evidence expressly to enhance a sentence." *Tejada,* 956 F.2d at 1263. They also failed to meet the objective test laid out in *Verdugo.* At the time of the illegal search of their residence, McIver and Eberle had not been indicted or charged with any offense. *Cf. Verdugo,* 402 F.2d at 609 (complaint charging Verdugo with one offense had been filed at time of illegal search). More importantly, it was not clear at the time of the search that sufficient admissible evidence existed to convict McIver and Eberle on any drug-related charge. *See id.* at 612 n. 21 ("Quite different considerations would apply if the object of the search were to obtain evidence to support a single charge on which the defendant was later convicted. If the additional evidence was necessary to obtain *any* conviction at all, the danger of exclusion at trial would afford a substantial deterrent to an illegal search."). It is true that the officers had photographic evidence that McIver and Eberle were in the vicinity of the plants. However, they were not depicted watering or cultivating the plants. Furthermore, the cameras recorded the images of other individuals near the site. Under these circumstances, law enforcement officers could not be confident that a jury would conclude that both McIver and Eberle were responsible for tending and harvesting the plants. The district court did not err in considering the fact that 63 marijuana plants were found in the basement of the McIver/Eberle residence as relevant conduct in calculating the Sentencing Guideline range under U.S.S.G. § 1B1.3.

AFFIRMED.

KLEINFELD, Circuit Judge, concurring:

I join in all of the majority opinion except for part II(B). That section holds

that installing tracking devices on the chassis of the automobile did not constitute a seizure subject to Fourth Amendment analysis. I think installing tracking devices on automobiles and airplanes is subject to Fourth Amendment analysis as a seizure. Nevertheless error in failing to suppress on this ground was harmless. The evidence was overwhelming, and McIver was so successfully tracked visually that the transmissions from the devices attached to his car were superfluous.

The police installed two devices on McIver's car as well as an antenna under the bumper cover. The officer who installed one of them testified that installation went "not very well." He had no prior experience installing this type of equipment. The wrong kinds of batteries were installed, which "actually shorted themselves out." The second device was apparently installed successfully and worked fine.

Electronic transmitters are installed by police officers on cars, airplanes, boats and other vehicles so that they can track them. The devices emit radio signals. The police use receivers to pick up the signals and identify where they are coming from. Some of the devices emit constant or frequent signals, some occasional signals. They may be combined with global positioning devices.

When a transmitter is installed on or in a vehicle without the owner's consent there may not be an invasion of any area for which there is a reasonable expectation of privacy, but I think the law requires us to treat the installation as a seizure for Fourth Amendment purposes. Property is seized, for purposes of Fourth Amendment analysis, where there is "some meaningful interference with an individual's possesso-

ry interests."[1] The interest to which seizure analysis is addressed in this case is not a person's liberty to drive on a public street without a police officer watching, because that liberty is not protected. Rather, it is the possessory interest of the owner of a vehicle in excluding individuals from performing mechanical work on his vehicle or altering it without his consent.

Fourth Amendment analysis was extended from protection of property to protection of privacy, to protect privacy from government intrusion even where the individuals intruded upon lack any property interest in the area where the intrusion was made.[2] That the Fourth Amendment does protect privacy even where the protected person has no property, does not imply that where the person does have a property interest, it is not protected from seizure in the absence of a privacy interest. The Supreme Court recently so held, unanimously, in *Soldal v. Cook County*,[3] as we noted in our en banc opinion in *Armendariz v. Penman.*[4] *Soldal* holds, in the total absence of any privacy interest, that "the Fourth Amendment protects property as well as privacy."[5] Though the Court had previously, in *Cardwell v. Lewis*,[6] upheld a search in which paint was scraped from a murder suspect's car, *Soldal* notes that in *Cardwell* only a four Justice plurality joined in that view, there was probable cause at the time to seize the car, and "both the plurality and dissenting Justices considered the defendant's auto deserving of Fourth Amendment protection even though privacy interests were not at stake."[7]

Thus under *Soldal*, despite McIver's lack of a privacy interest in the chassis of his car, he had a right guaranteed by the Fourth Amendment to be free of a "seizure" of his car unless a search warrant

1. *United States v. Karo*, 468 U.S. 705, 712, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984).

2. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

3. *Soldal v. Cook County*, 506 U.S. 56, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992).

4. *Armendariz v. Penman*, 75 F.3d 1311, 1320 (9th Cir.1996) (en banc).

5. *Soldal*, 506 U.S. at 62, 113 S.Ct. 538.

6. *Cardwell v. Lewis*, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974).

7. *Soldal*, 506 U.S. at 65, 113 S.Ct. 538.

issued upon probable cause or there was a special exigency. Though exigency that avoids the need for a warrant easily arises in automobile search and seizure cases, no finding of exigency has been made, nor has exigency been urged, as a reason to dispense with a search warrant in this case.

Whether installing a transmitter on or in a vehicle is a "seizure" for Fourth Amendment purposes depends on whether the installation involves "some meaningful interference with an individual's possessory interests."[8] "One of the main rights attaching to property is the right to exclude others."[9] Owners of vehicles assiduously exclude others from touching or altering the mechanical parts of their vehicles without consent.

American cities are cacophonous with the noise of car alarms, because people arrange to be alerted if anyone touches their cars. They do not like strangers touching their cars. Nor is their concern necessarily misplaced. A police officer not trained as a mechanic might unwittingly damage an automobile in the course of installing a transmitter. In the case at bar, the police officer who installed one of the devices testified that because of an error regarding batteries, the batteries some time after installation "shorted themselves out." Shorts emit heat, a serious safety concern near a gasoline tank.

Now that automobile operation depends heavily on electronic signals between components and computers, owners would naturally be concerned lest radio transmitters and magnets might affect safety and proper operation of the vehicles. Cosmetic damage from scratches as the devices are installed and removed and adhesives might affect resale value. With airplanes and boats, the safety concerns of owners are likely to be magnified. Anyone who boards an airplane is told to turn off all Walkmans, CD players, and other devices upon takeoff and landing because they may emit radio signals that would interfere with safe operation of the airplane. An owner of a boat or airplane would reasonably be concerned that a police transmitter would do the same thing for the same reason, jeopardizing his and his passengers' safety. An airplane owner would also be deeply concerned about the safety risk if anyone but a certified aircraft mechanic did anything to his plane.

This is not to say that police officers may not attach transmitters to automobiles. The point of the discussion above is that the owner of a vehicle has a possessory interest that is meaningfully interfered with if a transmitter is installed, even where the installation does not interfere with a reasonable expectation of privacy. That is to say, installing a beeper is a seizure. Many seizures by law enforcement officers are permissible under the Fourth Amendment. Fourth Amendment law is especially tolerant of seizures of vehicles, because they are so easily moved. But it is one thing to justify a seizure, and quite another not to treat substantial interference with possessory interests as a seizure.

In this case, no warrant was obtained to allow the seizure, and no exception such as exigency was urged to avoid the need for a warrant. All that the government has argued is that the transmitter was installed when the car was outside the curtilege, an argument that disregards the owner's possessory interest in his car, as opposed to his privacy interest in his curtilege.

Surprisingly, I have not found much definitive law on this issue. The Supreme Court has spoken on the related issues discussed above, but not on whether installation of a transmitter on or in a vehicle is a seizure for purposes of Fourth Amendment analysis. Three Justices have noted that certiorari might be desirable on "the legality of a warrantless installation of a beeper."[10] We have carefully distin-

---

8. *Karo*, 468 U.S. at 712, 104 S.Ct. 3296.

9. *Rakas v. Illinois*, 439 U.S. 128, 143 n. 12, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

10. *Michael v. United States*, 454 U.S. 950, 102 S.Ct. 489, 70 L.Ed.2d 257 (1981) (dissent from denial of petition for certiorari).

guished in our circuit's "beeper" cases between the Fourth Amendment interests at stake in monitoring the signals, and those at stake in installation of the devices, and have not reached the question whether installation without consent is a seizure.[11] Other circuits are in some disarray, and most or all of the beeper decisions focus exclusively on privacy, having come down before *Soldal* made it clear that property interests needed to be considered even if privacy interests were negligible.[12]

Much of the disarray in the law arises from confusion of the privacy interests and the property interests protected by the Fourth Amendment. Although transmitters reduce the privacy of the people who travel without knowing that they are carrying transmitters, the law is clear that this privacy interest is not protected under the Fourth Amendment, where the travel is public.[13] If the owner of a car consents to installation of a transmitter in his car, this consensual alteration would probably not turn into a "seizure" for Fourth Amendment purposes if the car were transferred to another.[14] *United States v. Karo*,[15] upon which the majority relies, does not involve nonconsensual installation of a transmitter on an automobile, as the case at bar does. In *Karo*, the DEA agents, authorized by a court order, installed a transmitter in a can of ether that the government owned at the time, then had their cooperating individual sell the can of ether to the cocaine dealers who would unknowingly transmit their location when they moved the can. The Court held that this did not interfere meaningfully with the cocaine dealers' possessory interests in the can.[16] *Karo* is analogous to the owner consenting to installation of a beeper on his car, and then selling it with the beeper installed to another.

Law enforcement needs regarding beepers can be adequately served by search warrant procedures, and the broad exceptions to search warrant procedures for easily moveable vehicles. Those are not the only interests deserving of protection. People care about their cars, planes and boats, and often object vehemently to any unconsented to mechanical work or even touching of these valuable effects. That concern is protected by the law of property and by the Fourth Amendment right to be free from unreasonable seizures. In the absence of a warrant issued by a neutral magistrate, or applicability of an exception to the Fourth Amendment warrant requirement, people are entitled to keep police officers' hands and tools off their vehicles.

---

**11.** *United States v. Brock*, 667 F.2d 1311, 1318–22 (9th Cir.1982); *United States v. Miroyan*, 577 F.2d 489, 492 (9th Cir.1978).

**12.** *See United States v. Michael*, 645 F.2d 252 (5th Cir.1981) (en banc); *United States v. Bailey*, 628 F.2d 938 (6th Cir.1980); *United States v. Moore*, 562 F.2d 106 (1st Cir.1977); *United States v. Holmes*, 537 F.2d 227 (5th Cir.1976) (en banc).

**13.** *United States v. Knotts*, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983).

**14.** *United States v. Karo*, 468 U.S. 705, 712, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984).

**15.** *Id.*

**16.** *Id.* at 712–13, 104 S.Ct. 3296.