**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

STEVE VANKESTEREN,

*Defendant-Appellant.*

No. 08-4110

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Rebecca Beach Smith, District Judge.
(2:07-cr-00153-RBS-1)

Argued: December 3, 2008

Decided: January 8, 2009

Before MOTZ, GREGORY, and SHEDD, Circuit Judges.

Affirmed by published opinion. Judge Gregory wrote the opinion, in which Judge Motz and Judge Shedd joined.

## COUNSEL

**ARGUED:** James Orlando Broccoletti, ZOBY & BROCCO-LETTI, Norfolk, Virginia, for Appellant. Dee Mullarkey Sterling, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee. **ON BRIEF:** Chuck Rosen-

berg, United States Attorney, Alexandria, Virginia, for Appellee.

**OPINION**

GREGORY, Circuit Judge:

The appellant in this case, Steve Vankesteren, invites us to consider the application of the Fourth Amendment to a product of modern surveillance technology: namely, a hidden, fixed-range, motion-activated video camera placed in the appellant's open fields. We find that the protective wall of the Fourth Amendment does not shield the appellant from the Commonwealth's use of such a camera, and we therefore affirm the decision of the district court.

I.

Appellant Vankesteren is a farmer on the Eastern Shore of Virginia. In December 2006, the Virginia Department of Game and Inland Fisheries ("VDGIF") received a telephone call alerting them that a protected bird was trapped in a cage in Vankesteren's fields near a public road. Steve Garvis, an agent with VDGIF, responded to the call and observed a trap that was one-to-two feet high and contained five leghold traps—one on top of the cage and four surrounding it. The trap was uncovered and set, and it contained one live and one dead pigeon inside. Garvis had allegedly seen a similar trap on Appellant's property in 2003 and on the internet being advertised for the purpose of hawk trapping. In January 2007, Garvis contacted the VDGIF's Special Operations Division in order to obtain video surveillance of the trap. Such cameras were used because there were only five VDGIF special agents in the Commonwealth. The camera had a viewing area of twelve-by-twelve feet, ran only during daylight hours, and was motion activated. On January 11, 2007, Garvis and the

special operations agents installed the camera without a warrant.

On January 24, 2007, Special Operations Agent Gene Agnese notified Garvis that he had obtained surveillance footage of two birds being trapped and killed at the site of the camera. Vankesteren killed the first bird on January 17. Garvis could not identify the bird in the footage with certainty, but he narrowed the possibilities to a red-tailed hawk, broadwing hawk, or red-shouldered hawk. Vankesteren killed the second bird with an ax on January 20, and Garvis identified the bird in that footage as a red-tailed hawk. Agnese advised Garvis that their carcasses were likely along the hedgerow by the trap, just outside the camera's viewing area. On January 25, 2007, Garvis went to the area and located the carcasses. He identified both of the birds by their markings as red-tailed hawks. One of the hawks had sustained severe head damage, consistent with the video footage, and the other carcass was of an immature red-tailed hawk. The birds had not been eaten and had not begun decomposing.

On January 30, 2007, Garvis and Agent Dan Rolince of the U.S. Fish and Wildlife Service met with Vankesteren at his residence. He admitted to catching some hawks by accident and placing their carcasses by the hedgerow. Vankesteren was charged in the U.S. District Court for the Eastern District of Virginia with two counts of taking or possessing a migratory bird without a permit, in violation of 16 U.S.C. § 703 (2006) and 50 C.F.R. § 21.11 (2008). Vankesteren appeared pro se before a magistrate judge on August 7, 2007. The judge refused to suppress the video surveillance footage and found the appellant guilty on both counts, imposing a $500 fine for each count, along with a $10 special assessment and $25 processing fee. Vankesteren appealed the magistrate judge's ruling, but the district court found no error and entered a final judgment against him on December 21, 2007. Vankesteren subsequently appealed to this Court.

## II.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 (2000). "In reviewing a denial of a suppression motion, the court reviews the district court's factual findings for clear error and the district court's legal conclusions *de novo*." *United States v. Johnson*, 114 F.3d 435, 439 (4th Cir. 1997). We review the sufficiency of evidence on appeal by viewing it and all inferences "in the light most favorable to the Government." *United States v. Bursey*, 416 F.3d 301, 306 (4th Cir. 2005). Findings of law are reviewed de novo, and findings of fact are reviewed for clear error. *Id.*

### A.

Vankesteren largely conceded in oral argument that the VDGIF placed its camera in a constitutionally unprotected open field, but a review of the Supreme Court's open-fields doctrine is nonetheless essential to our consideration of this case. In *Hester v. United States*, 265 U.S. 57, 59 (1924), the Supreme Court first held that the protection of the Fourth Amendment did not extend to open fields. In that case, revenue officers went to Hester's house and observed an illegal moonshine transaction from fifty to one-hundred yards away on Hester's land. *Id.* at 58. The Court found no Fourth Amendment violation. *Id.* at 59.

The open-fields doctrine was clarified in *Oliver v. United States*, 466 U.S. 170 (1984). There, the Supreme Court considered two cases in which marijuana was being grown in wooded areas on the defendants' properties. In one instance, the police walked around a locked gate with a "No Trespassing" sign, passed a barn and parked camper, and continued after someone shouted at them to leave. A mile from the defendant's house, they found the marijuana field. *Id.* at 173. In the other case, police followed a path between the defendant's residence and the neighboring house into the woods until they saw two marijuana patches surrounded by chicken

wire. Upholding both searches, the Court held that "an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home [the curtilage]." *Id.* at 178. The Court further noted, "An open field need be neither 'open' nor a 'field' as those terms are used in common speech. For example . . . a thickly wooded area nonetheless may be an open field as that term is used in construing the Fourth Amendment." *Id.* at 180 n.11.

In *United States v. Dunn*, 480 U.S. 294 (1987), the Supreme Court considered a case that involved property that was approximately fifty yards from the main residence and on which officers took the following actions:

> [They] crossed over the perimeter fence and one interior fence. Standing approximately midway between the residence and the barns, the DEA agent smelled what he believed to be phenylacetic acid, the odor coming from the direction of the barns. The officers approached the smaller of the barns—crossing over a barbed wire fence—and, looking into the barn, observed only empty boxes. The officers then proceeded to the larger barn, crossing another barbed wire fence as well as a wooden fence that enclosed the front portion of the barn. The officers walked under the barn's overhang to the locked wooden gates and, shining a flashlight through the netting on top of the gates, peered into the barn.

*Id.* at 297-98. Once more, the Court found that there was no Fourth Amendment violation. *Id.* at 301.

The *Dunn* Court established four factors to consider when resolving questions about the boundaries of curtilage: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding

the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Id.* at 301; *accord United States v. Breza*, 308 F.3d 430, 435 (4th Cir. 2002). Applying the factors, the Court found that the barn was sixty yards from the house, it was outside the fence surrounding the house, police had objective data—aerial photographs—that showed the barn was not being used for intimate activities, and there was no indication that the interior fences were designed to keep people out. *Dunn*, 480 U.S. at 302-03.

Given the facts of these Supreme Court decisions, Vankesteren has little on which to base his case. Vankesteren's fields were located a mile or more from his home, the land was being used for farming and not intimate activities, VDGIF had received a report of a trapped protected bird, and there is no indication in the record that Vankesteren had taken any steps to protect his field from observation. Therefore, under the Supreme Court's jurisprudence, the subject land must be classified as open fields and not curtilage, and Vankesteren has no reasonable expectation of privacy in those open fields.

As noted previously, Vankesteren has essentially conceded this point. Vankesteren instead stakes his case on the argument that hidden surveillance cameras are subject to a higher degree of Fourth Amendment scrutiny. He cites cases in support of that proposition; yet, none of these cases involve open fields where the defendant presumably has no reasonable expectation of privacy.

In *United States v. Taketa*, 923 F.2d 665 (9th Cir. 1991), the Ninth Circuit found that a DEA agent had a reasonable expectation of privacy in his office, and that expectation was violated through the use of hidden video surveillance. In so finding, however, the court noted, "Video surveillance does not in itself violate a reasonable expectation of privacy. Videotaping of suspects in public places, such as banks, does not

violate the fourth amendment; the police may record what they normally may view with the naked eye." *Id.* at 677. In *United States v. Nerber*, 222 F.3d 597 (9th Cir. 2000), the Ninth Circuit suppressed hidden video surveillance, but did so because it found that drug dealers had a legitimate expectation of privacy in their hotel room after police informants left.

The Fifth Circuit considered a closer case in *United States v. Cuevas-Sanchez*, 821 F.2d 248 (5th Cir. 1987). There, the police placed a camera on top of a power pole overlooking the defendant's ten-foot-high fence surrounding his back yard. The court found that the defendant had a reasonable expectation of privacy that would have been violated because the fence surrounded his curtilage. However, because the police properly obtained a court order for the surveillance, the court affirmed his conviction. *Id.* at 251-52. This case also does not help Vankesteren because VDGIF's camera was not placed within or even near the curtilage of his home.

Vankesteren then attempts to distinguish his case from *United States v. McIver*, 186 F.3d 1119 (9th Cir. 1999), the most directly relevant case on this issue. In that case, law enforcement agents placed unmanned, motion-activated surveillance cameras onto land in a national forest in order to monitor a patch of marijuana plants. The agents used the footage from the cameras in order to identify and track down the defendants in the case. The court held that the placement of the cameras on public land, open to all, did not violate the defendants' Fourth Amendment rights. *Id.* at 1125-26.

While *McIver* involved public land and this case involves private land, the effect is still the same: just as one would not have a reasonable expectation of privacy in a national forest, the foregoing cases demonstrate that Vankesteren had no reasonable expectation of privacy in the open fields where he killed the hawks. Those fields were located a mile or more from his home, near a public road, and as evidenced by the phone call reporting the trap, the land was accessible to other

members of the public. Vankesteren notes that he felt comfortable enough to relieve himself there, but that is of no consequence under our jurisprudence.[1]

The idea of a video camera constantly recording activities on one's property is undoubtedly unsettling to some. Individuals might engage in any number of intimate activities on their wooded property or open field—from romantic trysts under a moonlit sky to relieving oneself, as in Mr. Vankesteren's case—and do so under the belief that they are not being observed. But the protection of the Fourth Amendment is not predicated upon these subjective beliefs. "[O]pen fields do not provide the setting for those intimate activities that the Amendment is intended to shelter from government interference or surveillance." *Oliver*, 466 U.S. at 179. Anyone could have walked onto Vankesteren's property, including a VDGIF agent, and observed his traps. Under our jurisprudence, VDGIF could have stationed agents to surveil Vankesteren's property twenty-four hours a day. *See id.* at 178-81; *McIver*, 186 F.3d at 1125. That the agents chose to use a more resource-efficient surveillance method does not change our Fourth Amendment analysis.

Since Vankesteren had no legitimate expectation of privacy, the agents were free, as on public land, to use video surveillance to capture what any passerby would have been able to observe. As the Supreme Court noted in *Dow Chemical Co. v. United States*, 476 U.S. 227, 238 (1986), when it was assessing the constitutionality of aerial surveillance by the EPA:

> It may well be, as the Government concedes, that surveillance of private property by using highly sophisticated surveillance equipment not generally

---

[1]Indeed, if Fourth Amendment protection were to be predicated upon where one felt comfortable enough to eliminate, our search and seizure jurisprudence would be turned on its head.

available to the public, such as satellite technology, might be constitutionally proscribed absent a warrant. . . . [But t]he mere fact that human vision is enhanced somewhat, at least to the degree here, does not give rise to constitutional problems.

(internal footnote omitted). Likewise, the placement of a video camera in an open field does not portend the arrival of the Orwellian state that the appellant would have us fear. We are not dealing in this case with a camera that took, for instance, thermal images of Vankesteren's home[2] or that was equipped with an automatic guidance system that allowed it to roam about Vankesteren's property, possibly into protected Fourth Amendment areas. Instead, this camera was in a fixed location, was focused on a limited area of Vankesteren's fields, was activated only by motion, and recorded only during the daylight hours. Essentially, the camera did little more than the agents themselves could have physically done, and its use was therefore not unconstitutional.

### B.

Vankesteren makes an additional argument that the government failed to prove that he killed a red-tailed hawk on January 17. In support of this proposition, he notes that Agent Garvis thought the bird killed on that day could have been a red-tailed hawk, a broadwing hawk, or a red-shouldered hawk. Yet, given that we must construe the evidence in the light most favorable to the government, that Agent Garvis discovered two red-tailed hawks at the killing site, and that Vankesteren actually admitted to killing the two hawks, the district court's decision was not in error, let alone clear error.

---

[2]*See Kyllo v. United States*, 533 U.S. 27 (2001).

### III.

We hereby reject each of the appellant's contentions and affirm the decision of the district court in full.

*AFFIRMED*