Filed 3/12/13  P. v Eason CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# COPY

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C060562 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF065858) |
| v. | ORDER MODIFYING OPINION AND DENYING REHEARING |
| ROBERT ERIC EASON, | |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on February 13, 2013, be modified as follows:

On page 17, immediately following the first full paragraph and preceding the heading "Disposition," the following language is added:

      Nor was *Zichwic*'s holding that the installation of the electronic monitoring device (EMD) was not a search mere dicta, as argued by defendant in his petition for rehearing.

      In *Zichwic*, law enforcement officers suspected the defendant, who was on searchable parole, of being involved in a string of recent burglaries and attached an EMD to the undercarriage of his truck in his driveway. When the defendant drove away, the EMD allowed the officers to follow his truck to a PG&E yard, where they caught him stealing tools. (*Zichwic,*

1

*supra,* 94 Cal.App.4th at pp. 948-950.) Charged with the thefts, the defendant unsuccessfully moved to suppress the evidence. (*Id.* at p. 948.)

On appeal, the defendant argued that attachment of the EMD constituted a search. He challenged, as not comporting with federal constitutional precedent, the decision in *People v. Reyes* (1998) 19 Cal.4th 743 upholding parole searches that are not arbitrary, capricious, or harassing. And he argued the search was arbitrary and capricious within the *Reyes* decision. (*Zichwic*, *supra*, 94 Cal.App.4th at p. 951.)

*Zichwic* rejected all three arguments. On the question of whether installation of the device constituted a search, after examining federal precedent, the court declared: "There can be no objectively reasonable expectation of privacy in what is regularly exposed to public view. While the undercarriage of a vehicle is not as readily seen as the hood, doors, and other parts of its exterior, the undercarriage is part of the exterior that is ordinarily exposed to public view. It does not amount to a search to examine the undercarriage, to touch it, or to attach a tracking device, so long as a police officer does so from a place where the officer has a right to be." (*Zichwic, supra,* 94 Cal.App.4th at pp. 955-956.)

Defendant insists the *Zichwic* case was resolved once the court declared the parole search condition valid. "There was no need for the court to rule on any other issue related to the officers' conduct," and therefore any further discussion of the search issue was dicta. Not so. "[W]hen a decision is based on two separate grounds, neither is dictum." (*Varshock v. Department of Forestry & Fire Protection* (2011) 194 Cal.App.4th 635, 646, fn. 7; see *People v. Rolon* (2008) 160 Cal.App.4th 1206, 1214-1215 [" ' "When an appellate court bases its decision on alternative grounds, none is dictum." [Citation.]' "].) The court's conclusion that installation of an EMD on a vehicle does not constitute a search is no more dicta than its discussion of the parole search condition. Indeed, in light of that conclusion, any discussion of parole search conditions was unnecessary.

That it was the intent in *Zichwic* to dispose of the defendant's contentions on alternative theories is further demonstrated by its summation: "For all the reasons above, we conclude that the trial court did not err in denying defendant's suppression motion." (*Zichwic, supra,* 94 Cal.App.4th at p. 956.)

Defendant also contends that *Zichwic* "did not rule on the issue of monitoring a suspect's movements with the [EMD], and therefore could not

provide binding appellate precedent." This is true. Nevertheless, at the time of the monitoring of the GPS device in the instant case, there was binding appellate authority on the issue. In *People v. Henderson* (1990) 220 Cal.App.3d 1632, 1645-1646, the court stated: "[M]onitoring of an electronic tracking device, which does not transgress privacy expectations when it is installed, has been held not to be a search subject to Fourth Amendment protection 'unless the monitoring reveals information that could not have been obtained through visual surveillance.' [Citation.]" Additionally, in *United States v. Knotts* (1983) 460 U.S. 276 [75 L.Ed.2d 55], the court held that the warrantless monitoring of a beeper in a vehicle did not violate the Fourth Amendment because "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." (*Knotts*, at p. 281.)

There is no change in the judgment.

Appellant's petition for rehearing is denied.

BY THE COURT:


          RAYE          , P.J.


          HULL          , J.


          HOCH          , J.

Filed 2/13/13  P. v. Eason CA3 (unmodified version)

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C060562 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF065858) |
| v. | |
| ROBERT ERIC EASON, | |
| Defendant and Appellant. | |

A jury convicted defendant Robert Eric Eason of 12 counts of arson of forest land (Pen. Code, § 451, subd. (c) -- counts 1-12)[1] and two counts of possession of an incendiary device (§ 453, subd. (a) -- counts 13-14).  The jury also found true as to each arson count an enhancement for starting a fire with a device designed to accelerate or delay the fire.  (§ 451.1, subd. (a)(5).)  The jury hung on four counts of arson of forest land (counts 15-18), and a mistrial was declared as to those counts.  Defendant was sentenced to prison for 40 years.

---

[1] Hereafter references to undesignated sections are to the Penal Code.

1

On appeal, defendant contends the evidence is insufficient to prove any of the arson offenses, and even if there were sufficient evidence to so prove, there is not sufficient evidence to support the enhancements. In supplemental briefing, defendant contends his counsel's failure to move to suppress, on Fourth Amendment grounds, evidence obtained by fire investigators who, without a warrant, monitored his movements for approximately two months by means of a global positioning satellite device (GPS device) covertly attached to his vehicle deprived him of effective assistance of counsel. We reject defendant's contentions.

## FACTS

The 12 arson fires of which defendant was convicted occurred from July to October in 2006 (unless otherwise stated, all dates refer to the year 2006). During this time, defendant lived on his parents' rural property in Guinda with his wife and children, aged 11, 7, and 3. Defendant worked as a security guard at Cache Creek Casino from 4:30 p.m. to 12:30 a.m., and he was a volunteer firefighter for the Capay Valley Volunteer Fire Department (CVVFD).

Errett Crum knew defendant from their work as security guards at Cache Creek Casino and volunteer work as firefighters. Although Crum could not recall just when, at some point defendant had told him that someone was setting fires in the Capay Valley using a mosquito coil as a delay device.[2] Defendant explained to him that matches could be attached to one end of the coil, the coil could be lit at the other end, the coil would burn down and ignite the matches, and nothing would be left of the device.

### Ice Chest Fire (Count 1)

Around 10:30 to ll:00 p.m. on July 29, Dean Hogan was driving with his wife on Highway 16 to the Cache Creek Campground when they saw a grass fire on the roadside

---

[2] Defendant recalled the time of this conversation, which he described as "pretty accurate," to be July 30.

near Windy Point Bridge. Using a blanket and ice from his ice chest, Hogan put out the fire. Roadside camera HD-11, located 1.9 miles from the fire, showed defendant's vehicle driving at 10:43 p.m. Fifteen vehicles passed the camera in the two hours preceding the fire.

Alan Carlson, a deputy chief and investigator for the California Department of Forestry and Fire Protection (CAL FIRE), and Dave Harp, a battalion chief also with CAL FIRE, investigated the fire and concluded it was caused by arson.

Defendant testified that even though the camera showed his vehicle in the vicinity of the fire that night, he had no memory of being there but speculated that he might have just gone for a drive.

**Creek (Count 2) and Rumsey (Count 3) Fires**

During the early afternoon of July 30, defendant and other firefighters from CVVFD responded to a water rescue near Windy Point Bridge. Camera HD-11 photographed defendant's vehicle going to the rescue at 12:52 p.m. and returning at 1:51 p.m. The same camera showed defendant driving into Rumsey Canyon at 2:57 p.m. and returning at 3:03 p.m. At 3:30 p.m., CVVFD firefighters were dispatched to two roadside fires on Highway 16 near Windy Point Bridge. The fires were about 100 yards apart and on opposite sides of Highway 16. Investigators Carlson and Harp concluded that each fire was caused by arson.

Defendant testified he had driven by the locations of the fires because he was looking for equipment left behind earlier at the water rescue.

**Road 82 Fire (Count 4)**

Shortly after midnight on August 10, CAL FIRE officers attached a GPS device to defendant's vehicle.

At 4:38 p.m. on August 10, CAL FIRE officers were dispatched to a roadside fire on Highway 16, near Road 82. The fire was extinguished by firefighters from CAL FIRE, the Rumsey Rancheria Fire Department, and CVVFD. Investigator Christian

3

Abballo could not eliminate the fire's having been started by a particle from a faulty vehicle exhaust system, nor could he eliminate arson as a cause of the fire. Investigator Carlson attributed the cause of the fire to arson.

The GPS device attached to defendant's vehicle showed defendant's vehicle passing the fire location on Highway 16 at 4:12 p.m. at a speed of 51 miles per hour, doing a U-turn at 4:13 p.m., and passing the fire location again at 4:16 p.m. at a speed of 53 miles per hour. Defendant's vehicle made another U-turn at 4:18 p.m., passed the location of the fire about a minute later, and then returned home.

Defendant testified that at the time of this fire he believed he was dropping off his children at the school where his wife worked.

**Road 49 Fire (Count 5)**

On August 23, about 5:30 p.m., Mark Harman saw smoke coming from behind a stack of hay bales on his property near Road 49. Checking, Harman found a fire about 4 feet by 10 feet on the grass next to the bales. He threw water on the fire and then called 911. CVVFD firefighters, including defendant, responded to the call and checked the remnants of the fire. Fire Investigator Gary Prather could eliminate as the cause of the fire neither a vehicle emission nor arson. However, Investigator Carlson disagreed, concluding the cause of the fire was arson.

The GPS device showed defendant's car was driven on Highway 16, turned onto Road 59, turned again onto Road 49, turned once more onto Road 53, and then turned back onto Highway 16 without stopping. Defendant's vehicle drove by the location of the fire at 4:59 p.m., slowed to 19 miles per hour as it approached that location, then sped up and returned home at 5:04 p.m.

Defendant testified he passed the fire area because he was taking an alternative way home.

4

**Road 61 Fire (Count 6)**

On August 24, shortly after 4:00 p.m., CAL FIRE Captain Joseph Baldwin was dispatched to a roadside fire on Highway 16 near Road 61. The fire had started in a roadside ditch and burned about two acres before it was extinguished. Baldwin could not rule out the fire's having been started by a vehicle emission, a power line, or by arson. Investigator Carlson concluded the fire was arson caused.

The GPS device showed defendant's vehicle drove onto Highway 16 at 3:14 p.m., then turned, respectively, onto Roads 53, 49, 59, and back onto Highway 16 without stopping. The vehicle slowed to 39 miles per hour as it passed the fire location at 3:22 p.m., then, within 15 seconds, it sped up to 53 miles per hour as it drove on.

Defendant was in the area of this fire because he was picking up his children at school and took an alternative route to avoid road construction on Highway 16.

**Road 50 Fire (Count 7) and the Shadow Valley Road Fire (Count 8)**

On September 13, two calls for small roadside fires came in shortly after noon. Both fires were on Highway 16, one near Road 50 and the other near Shadow Valley Road. The fires were about three miles apart.

Eric Hoffman investigated the Road 50 fire and could not eliminate either a nonarson or an arson cause for the fire; however, he believed the fire was arson because it was within three miles of the Shadow Valley Road fire and was on the same side of the road. Carla Olsen investigated the Shadow Valley Road fire and opined that she had reason to believe it was started by a vehicle emission, but she could not rule out arson. However, Investigator Carlson believed both fires were caused by arson.

The GPS device showed that defendant's vehicle left his home at 11:22 a.m. and drove onto Highway 16. As the vehicle passed the Road 50 fire location at 11:24 p.m., it slowed from 52 to 37 miles per hour, then sped up to 51 miles per hour and passed the Shadow Valley Road fire location at 11:27 a.m. The vehicle then stopped at the school

5

that defendant's children attended; was driven to Woodland, where it stopped at various business locations; and then returned to defendant's home at 4:31 p.m.

Defendant testified he was in the fire area because he had picked up his son to take him to a doctor's appointment and to run errands.

**Highway 16 Fire (Count 9)**

At 1:15 p.m. on September 17, Chris Vallerga, a fire investigator, reported a roadside fire on Highway 16. The fire burned about five acres before it was extinguished. Vallerga collected a white, nongranular, powdery ash, an ash which can be left by a burnt mosquito coil, in the area of the fire's origin, but the sample was never analyzed because it was misplaced. Vallerga concluded the fire was arson caused. Matthew Lee, another investigator, concluded the cause of the fire was undetermined.

The GPS device showed defendant's vehicle left his home at 11:10 a.m., stopped at the intersection of Highway 16 and Road 44C for a couple of minutes, drove past the fire location at 11:19 a.m. at a speed of 54 miles per hour, and then continued to the casino where defendant worked, stopping at 11:25 a.m.

Defendant testified that he drove by this fire location because he was on his way to work.

**Orchard Fire (Count 10)**

On September 20, James Craven and an assistant were preparing a walnut orchard for harvesting, using a tractor, a flail mower, chainsaws, and a pickup truck, when Craven saw a roadside fire on County Road 49. Craig Hollis and defendant were dispatched to the fire at 3:57 p.m. Investigator Abballo was unable to determine the cause of the fire. Investigator Carlson testified that the pattern of the Orchard and Road 49 fires, coupled with their being set near haystacks, suggested they were arson caused.

The GPS device showed defendant's vehicle passed the fire location at 3:15 p.m., and as the vehicle approached and passed the location, it slowed from 40 to 32 miles per hour.

6

Defendant testified he likely drove by the fire location to pick up his children from school, but he had no specific memory for that time.

**County Road 82B Fire (Count 11)**

Shortly before midnight on September 22, Philip J. Phillips's father reported a fire on Phillips's sheep ranch bounded by County Roads 82B, 85B, 23, and Highway 16. Fire crews were dispatched and the fire was not extinguished until 3:30 or 4:00 a.m.; several hundred sheep burned to death and 600 acres of pasture burned. Investigator Olsen testified that while she had never known a firecracker of the type that had been found at the scene to have caused a fire, she could not exclude it and concluded the cause was arson. Likewise, Investigator Carlson concluded the single firecracker was unlikely the cause of the fire; instead, the cause was arson.

The GPS device showed defendant's vehicle left his home at 9:55 p.m. on September 21 and drove past the fire location at 10:15 p.m., executed a U-turn and drove past the location again at 10:23 p.m., and returned to defendant's home at 10:40 p.m.

Defendant testified that after work he had driven home to get his wallet and then to a bar where he was to meet with friends, but his friends were not there so he drove back home, thus accounting for his driving past the fire location twice.

**County Road 23 Fire (Count 12)**

At 5:12 p.m. on October 10, Deputy Sheriff Lori Olson reported a roadside fire on County Road 23 near County Road 85B. Edward Wright, who lived in the area, also saw the fire. Prior to the arrival of firefighters, Wright saw a red car drive through a stop sign, go off the road a little bit, and then take off. He thought the car might have started the fire.

Investigators Olsen and Lee differed as to the fire's area of origin. Olsen discounted the red car as being a source of the fire and eliminated other nonarson sources. In Olsen's opinion, the fire was intentionally set because she was unable to find anything that could have started it naturally or accidentally.

7

The GPS device showed defendant's car left his house at 3:17 p.m., made stops at two schools, and drove past the County Road 23 fire at 4:02 p.m., going about 25 miles per hour, and then drove back to Highway 16.

Defendant testified that after dropping off his children at his wife's school in Esparto, he started to return home, remembered he wanted a haircut, and returned to Esparto, thereby passing the fire location.

**Search of Defendant's Property**

On October 12, following an interview of defendant by fire investigators, defendant was taken into custody. Search warrants were obtained and on October 12 and 13 his home, surrounding property, and vehicles were searched.

In defendant's home, officers found five or six wooden matches in the pocket of a jacket bearing the CVVFD logo. A trash can outside defendant's home contained a double-layered plastic bag in which officers found two packages of mosquito coils, one opened, the other unopened; pieces of mosquito coils ranging in length from two to three inches and six to eight inches; two Cache Creek Casino matchbooks from which some of the matches had been torn at the halfway point; pieces of both lightweight and heavy-duty fishing line; an empty container for dental floss; a box made for six gopher gasser bombs that now contained only a single bomb; and two mosquito coils, each of which had part of a paper match head tied to it with fishing line.

In defendant's vehicle, officers found firefighting equipment, a fishing reel with fishing line on it, pieces of fishing line, a partially burned match head, pieces of partially burned wooden matches, two packages of dental floss, and on the front passenger seat a mark resembling an arc or spiral that appeared to be burned into the fabric. Defendant's fingerprints were on the boxes of mosquito coils.

Defendant's wife testified that although defendant occasionally took the children fishing, he was not a fisherman; he did not smoke but would light a barbecue, fireplace, or candle with a match; he did not use dental floss; and she did not use mosquito coils.

8

Defendant places great emphasis on the fact that no mosquito coil remnants were found at the scene of any of the fires he was convicted of setting. However, since there was testimony that if a mosquito coil or piece thereof burned completely then hardly a trace was left, the jury could reasonably conclude that such was the case in the 12 fires defendant was convicted of setting. (See *People v. Massie* (2006) 142 Cal.App.4th 365, 371 ["In reviewing a jury's determination, we view the whole record in a light most favorable to the verdict, drawing all reasonable inferences and resolving all conflicts in support of the jury's verdict. [Citation.] We must uphold the verdict unless it clearly appears that upon no hypothesis whatever is there sufficient evidence to support it."].)

From August 10, the date the GPS device was placed on defendant's vehicle, through October 10 there were nine grassland roadside fires in the Highway 16 corridor, from Esparto to Rumsey Canyon, and defendant's vehicle was within one-half to two hours of each fire. Defendant was charged with all of those fires.

**Defendant's Testimony**

In addition to defendant's testimony regarding why he was in the locations of the fires, as recounted above, defendant testified he had heard that mosquito coils could be used as devices for arson, but he bought them for repelling mosquitoes at home and when he took his son fishing. In 2006, because he was a fire captain, he decided to experiment with the coils, so he constructed four or five ignition devices to see how they could start a fire. He put the mosquito coil remnants in a bag, and someone must have thrown them in the trash accidentally. He could not explain why there was dental floss or a gopher gasser in the bag. His car was purchased used and the coil-shaped mark on the seat was there when he bought it.

**DISCUSSION**

**I**

Defendant contends the evidence is insufficient to support his convictions of any of the 12 counts of arson of which he was convicted. He argues as follows: "The

9

undisputed evidence proves that [he] drove by or near the location of each of the fires within an hour or two before each fire was reported. It also proves that [he] possessed at his home two mosquito coil devices that were capable of delaying the onset of a fire. But the prosecution failed to present any evidence of [his] motive to set the fires, any eyewitness observations implicating [him] in the fires, any physical evidence linking him to the fires, any statements by [him] incriminating himself in the fires, or any behavior by [him] demonstrating consciousness of guilt. [¶] [Therefore, t]he circumstantial evidence in this case is capable only of raising a suspicion of [his] guilt." We disagree, concluding the circumstantial evidence goes far beyond raising just a reasonable suspicion.

The rules regarding appellate review of challenges to the sufficiency of the evidence are well established. "To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.] [¶] . . . *Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be*

10

*reconciled with a contrary finding does not warrant the judgment's reversal."* (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358 (*Zamudio*), italics in second par. added.)

Here, as defendant acknowledges, he was driving in the location of each fire within an hour or two of the fire's being reported. Indeed, from August 10 to October 10 there were nine grassland roadside fires in the Highway 16 corridor from Esparto to Rumsey Canyon, and the GPS device secreted on defendant's vehicle on August 10 showed he was in the fire's location within the time frames during which the mosquito coils could have ignited the fires. (See *People v. Erving* (1998) 63 Cal.App.4th 652, 660-662 [from defendant's repeated presence at arson fires, jurors could reasonably infer she was the arsonist].)

Searches of defendant's property and vehicle, conducted on October 12 and 13, disclosed a trash can containing opened and unopened boxes of mosquito coils, bits of various lengths of mosquito coil, pieces of fishing line and dental floss, and paper matchbooks with some matches half torn out, all of which could be used in the construction of a mosquito coil time-delay ignition device. Additionally, two fully constructed mosquito coil ignition devices were found. Finally, there was expert testimony that each fire was arson caused.

On September 23, 2006, Investigator Carlson conducted experiments by throwing unlit mosquito coils and parts from a vehicle traveling 50 to 62 miles per hour to determine how far they could be thrown and what their condition would be when they landed. The throws ranged from 9 to almost 100 feet.

On October 17, 2006, investigators conducted more tests, this time with lit mosquito coil devices. Ten devices were thrown about 4 to 15 feet, while smoldering, onto a grassy strip along the shoulder of the road from a vehicle traveling around 50 miles per hour. The purpose of the test was to see the condition of the devices after they landed. Six remained intact and continued burning; four were broken, but of those four, two continued to burn while the other two were extinguished.

11

On October 20, 2006, the investigators placed three coil devices they had constructed on a grassy slope and ignited them. Three devices smoldered down to a match attached to the end of the device, one device ignited the grass before it smoldered down to its attached match, and the remaining device was ignited by a grass fire caused by one of the other coils. For the three that burned to the attached match, the average time was about an hour and a half, and no remnants of the coils remained.

In sum, from defendant's presence near the time of the reporting of each fire, expert testimony that each fire was arson caused, his possession of materials from which mosquito coil ignition devices could be made, and his possession of two fully constructed mosquito coil ignition devices, the jury could reasonably infer that he was the arsonist for each fire. That defendant offered an innocent explanation for the foregoing factors does not mean the jury was bound to accept his version of what could be inferred from the evidence. (*Zamudio*, *supra*, 43 Cal.4th at p. 357 [a reversal for insufficient evidence is unwarranted unless it appears that upon no hypothesis whatever is there sufficient substantial evidence to support the jury's verdict].) The evidence leaves little doubt, let alone a reasonable one, that defendant set the fires for which he was convicted.

## II

Defendant contends that even if the evidence is sufficient to prove his guilt of the 12 arson counts, it is insufficient to prove the enhancements that he started each fire by using a device intended to delay its ignition.[3]

---

[3] Section 451.1 provides, in relevant part: "(a) Notwithstanding any other law, any person who is convicted of a felony violation of Section 451 shall be punished by a three-, four-, or five-year enhancement if one or more of the following circumstances is found to be true: [¶] (1) The defendant has been previously convicted of a felony violation of Section 451 or 452. [¶] (2) A firefighter, peace officer, or other emergency personnel suffered great bodily injury as a result of the offense. The additional term provided by this subdivision shall be imposed whenever applicable, including any instance in which there is a violation of subdivision (a) of Section 451. [¶] (3) The defendant proximately

In support of this contention, defendant argues as follows: "The undisputed evidence proves that [he] possessed at his home two mosquito coil devices that could start a fire but delay the onset of the fire. But the prosecution failed to present any evidence that any such device was actually used to start any of the 12 fires for which [he] was convicted of arson." The argument is not persuasive.

"We review the sufficiency of the evidence to support [an] enhancement according to accepted rules of review: we view the record in the light most favorable to the prosecution and may not reverse the judgment if any rational trier of fact could have found the essential elements of the enhancement beyond a reasonable doubt." (*People v. Frausto* (2009) 180 Cal.App.4th 890, 897.)

For reasons pointed out in the previous section, substantial evidence supported the jury finding that defendant was the arsonist for the 12 fires he was convicted of setting. Clearly defendant had to use some type of delay device for igniting the fires. His possession of materials from which a mosquito coil ignition delay device could be constructed, coupled with his actual possession of two such devices and the expert testimony that when burned the devices frequently leave no evidence, constitutes substantial evidence that the device he was using was a modified mosquito coil.

## III

Relying on *United States v. Jones* (2012) ___ U.S. ___ [181 L.Ed.2d 911] (*Jones*), which held "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor [a] vehicle's movements, constitutes a 'search' [within the

---

caused great bodily injury to more than one victim in any single violation of Section 451. The additional term provided by this subdivision shall be imposed whenever applicable, including any instance in which there is a violation of subdivision (a) of Section 451. [¶] (4) The defendant proximately caused multiple structures to burn in any single violation of Section 451. [¶] (5) The defendant committed arson as described in subdivision (a), (b), or (c) of Section 451 and the arson was caused by use of a device designed to accelerate the fire or delay ignition."

meaning of the Fourth Amendment" (*id*. at p. ___ [181 L.Ed.2d at p. 918], fn. omitted), defendant contends he received ineffective assistance of counsel when his counsel failed to move to suppress evidence obtained by investigators from their having covertly attached a GPS device to the undercarriage of his vehicle without a warrant. The People respond counsel was not ineffective because at the time the officers placed the GPS device on defendant's vehicle, in August 2006, "it was settled law in California that officers did not need a warrant to attach a GPS tracking device to [defendant's] vehicle. Thus, reasonably competent counsel could have concluded that it would be useless to file a motion to suppress the GPS data."

We conclude that *Jones* is not retroactive and that counsel was not constitutionally ineffective for having failed to bring the suppression motion.

In *Davis v. United States* (2011) ___ U.S. ___ [180 L.Ed.2d 285], the Supreme Court held that "searches conducted in objectively reasonable reliance on binding appellate precedent [which is later overruled] are not subject to the exclusionary rule" (*id*. at p. ___ [180 L.Ed.2d at p. 290]) because "[e]xcluding evidence in such cases deters no police misconduct and imposes substantial social costs" (*id.* at p. ___ [180 L.Ed.2d at p. 302]).

In August 2006, when the investigators placed the GPS device on defendant's vehicle, there was binding California appellate precedent that such placement was not a search within the meaning of the Fourth Amendment, to wit, *People v. Zichwic* (2001) 94 Cal.App.4th 944 (*Zichwic*). *Zichwic* held that the placing of an electronic tracking device on the undercarriage of a pickup truck by a law enforcement officer, who was in a place where he had a right to be, was not a search.[4] *Zichwic* based its holding on the

---

[4] *Zichwic* initially noted that "[w]e find no California state precedent on whether it is a search to install an electronic tracking device on the undercarriage of a vehicle." (*Zichwic*, *supra*, 94 Cal.App.4th at p. 954.) Likewise, our research has failed to disclose

14

reasoning of *United States v. McIver* (9th Cir. 1999) 186 F.3d 1119 (*McIver*), which held that the placing of magnetized tracking devices on the undercarriage of the defendant's vehicle while parked in his driveway was not a search because the vehicle's exterior is not afforded a reasonable expectation of privacy.  (*Zichwic*, *supra*, 94 Cal.App.4th at p. 955; see also *United States v. Pretzinger* (9th Cir. 1976) 542 F.2d 517, 520 (*Pretzinger*) [attachment of electronic tracking device to vehicle moving on public thoroughfares is not a search].)

Hence, when the GPS tracking device was placed on the undercarriage of defendant's vehicle, *Zichwic* provided binding appellate precedent in California for the proposition that such an attachment was not a search, and therefore no search warrant was required.  Because research by counsel would have disclosed the foregoing precedent, counsel could have reasonably concluded that a motion to suppress the information obtained from the GPS device on Fourth Amendment grounds would have been futile.  Thus, counsel cannot be found constitutionally ineffective for failure to have brought a futile motion.  (See *People v. Catlin* (2001) 26 Cal.4th 81, 163 [counsel not required to make meritless suppression motion].)

At oral argument, appellate counsel for defendant suggested that notwithstanding *Zichwic,* trial counsel should have made a suppression motion because *Zichwic* was a Sixth District Court of Appeal opinion that might not have been binding on the Yolo County Superior Court.  The law is clearly to the contrary.

In *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450 (*Auto Equity*), the California Supreme Court addressed defense counsel's point.  There, the municipal court in Santa Clara County granted the defendant's motion for a new trial based upon its belief it was bound by a case out of the Second District Court of Appeal, which at that

any California precedent, either prior to *Zichwic* or in the period between *Zichwic* (December 21, 2001) and the publication of *Jones* (January 23, 2012), on the same issue.

time was the only case relevant to the motion. (*Id*. at pp. 453-454.) The plaintiff appealed to the appellate department of the superior court, which vacated the municipal court's grant of the new trial motion because it believed the Second District's case was wrongfully decided. (*Id.* at pp. 454-455.)

On review, the California Supreme Court held the appellate department's "determination was clearly in excess" of its jurisdiction. (*Auto Equity*, *supra*, 57 Cal.2d at p. 455.) The court explained: "Under the doctrine of *stare decisis*, all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction. . . . The decisions of this court are binding upon and must be followed by all the state courts of California. Decisions of every division of the District Courts of Appeal are binding upon all the justice and municipal courts and upon all the superior courts of this state, and this is so whether or not the superior court is acting as a trial or appellate court. . . . It is not [the] function [of inferior courts] to attempt to overrule decisions of a higher court." (*Ibid.*)

Consequently, had the trial court in this case been presented with a suppression motion, it would have been bound by the ruling in *Zichwic*.

Also at oral argument, appellate counsel urged that reasonably competent trial counsel would have brought a suppression motion because the law regarding the attchment of GPS devices to vehicles was still evolving. Again, this is not so. Defendant's trial took place in 2008. *Zichwic* was decided in 2001; the Ninth Circuit cases of *McIver, supra*, 186 F.3d 1119 and *Pretzinger, supra,* 542 F.2d 517 were decided, respectively, in 1999 and 1976. Additionally, *United States v. Lopez* (D.Del. 2012) ___ F.Supp.2d ___ [2012 U.S. Dist. LEXIS 128439] noted that "with regard to the case law available at the time [February 2010 to June 2, 2010] the GPS devices were installed [on the defendant's vehicles] in this case, there were no Federal Courts of Appeals decisions indicating that the warrantless use of GPS tracking devices was unreasonable and unlawful. Instead, prior to the D.C. Circuit's August 6, 2010 decision in *United*

16

*States v. Maynard* [(D.C. Cir. 2010) 615 F.3d 544] that warrantless GPS use is unreasonable, every circuit court that considered the question concluded that police do not need to obtain a warrant to install and monitor a GPS device on the exterior of a car, so long as that car remains on public roads." (*Lopez*, at p. ___ [2012 U.S. Dist. LEXIS 128439 at pp. *37-*38.)

Consequently, in light of the history of the law of search and seizure relating to the attachment of GPS devices to vehicles, it cannot reasonably be that such law was evolving at the time of defendant's trial, and therefore trial counsel cannot be faulted for not foreseeing the change.

**DISPOSITION**

The judgment is affirmed.

                                         RAYE        , P. J.

We concur:

        HULL      , J.

        HOCH      , J.

17