Filed 3/29/13  P. v. Castro CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JONATHAN CASTRO et al.,<br><br>    Defendants and Appellants. | A131168, A131508<br><br>(San Mateo County Super. Ct.<br>Nos. SC071424A & SC071424D) |

Police officers, acting without a search warrant, attached a global positioning system (GPS) device to the undercarriage of a car owned by defendant Jonathan Castro. Data from the GPS device was used to track the car and led to evidence linking Castro and his accomplices to a jewelry robbery.  After both the magistrate and the trial court denied their motion to suppress the evidence, defendants—Jonathan Castro, Jesus Ortiz-Hernandez, Nicolas Granados Mojica, Jose Miguel Figueroa, Juan Felix Sanchez, and Juan Martinez—pleaded no contest to felony taking of personal property from a victim (Pen. Code, § 212.5, subd. (c)).  All defendants except Martinez appeal.  (Pen. Code, § 1538.5, subd. (m); Cal. Rules of Court, rule 8.304(b)(4)(A).)  Defendants primarily contend the installation and use of the GPS device was a search in violation of the Fourth Amendment.  We reject defendants' contentions and affirm.

## I.  PROCEDURAL BACKGROUND & FACTS

Los Angeles Police Detective Daniel Nee, a member of the Interstate Theft Task Force, testified at the preliminary hearing as an expert on organized theft gangs, including those comprised of Columbian nationals.  Certain Columbian theft gangs

specialize in stealing from travelling jewelry salesmen, using mobile surveillance of their movements by multiple accomplices in multiple cars. Such gangs tended to sacrifice getaway cars, switch to "lay-off," or secondary, vehicles, switch license plates on vehicles, and engage in counter surveillance including last-minute freeway entrances and exits, multiple turns, and abrupt starts and stops.

On January 6, 2010, Los Angeles Police Detectives Carol Mosher and Marcelo Raffi, also members of the Interstate Theft Task Force, along with FBI Agent Aimaro, conducted surveillance of a white Ford Explorer.[1] They suspected the occupants—defendants Ortiz-Hernandez and Mojica and a third man—of casing jewelry businesses as part of a theft group. The officers saw the Explorer near several jewelry stores in La Puente and then at the Fullerton Jewelry Mart, where Ortiz-Hernandez and Mojica got out of the vehicle. Ortiz-Hernandez walked to a jewelry store window, looked inside, and made a hand signal to Mojica. The two men returned to the Explorer and drove to the Asian Jewelry Mart in Westminster.

At the Asian Jewelry Mart, the Explorer parked near My Kim Jewelry. Ortiz-Hernandez got out, walked to the store window, and looked inside. The Explorer moved closer to the store, and then Ortiz-Hernandez got back inside. He got back out and stood in front of the store. The Explorer moved again, and Ortiz-Hernandez again got back inside. The Explorer drove off after the occupants were confronted by security guards. Detectives Baez and Barnes, also part of the surveillance team, saw the Explorer heading toward 4th Street and Virgil Avenue in Los Angeles.

On January 7, Detectives Baez and Barnes went to the area of Virgil Avenue and saw the three men who had been in the Explorer the previous day—but this time they were in a silver Acura MDX. This vehicle, a four-door SUV, was registered to defendant Castro. Detective Mosher saw the Acura enter the 101 freeway and travel north. The Acura left the freeway and rendezvoused with a silver Infiniti. Detective Raffi saw the three men leave the Acura, speak to two other people, and return to the Acura. The two

_____

[1] In this statement of facts, all dates are in 2010.

2

vehicles, traveling together, drove to the 405 freeway and entered it. On the freeway, they drove close together, changing lanes at the same time, for 15 miles. The vehicles exited the freeway in opposite directions and were lost by the surveillance team. Later that day, a silver Acura MDX was used in a jewelry robbery in the Westminster area.

On January 8, Detectives Barnes and Marentez went to 4th Street and Virgil Avenue. They saw the Ford Explorer and followed it to the Panorama City Mall, where it met with a second Explorer. Defendant Juan Martinez left the second Explorer and spoke to an occupant of the first Explorer.[2]

The detectives on the surveillance team concluded Castro's Acura MDX was a "working vehicle"—which means a vehicle the theft group "would go out and hunt in"—and focused on it.

Early in the morning of January 12, Detectives Nee and Raffi saw the Acura parked in the underground parking garage of an apartment building at 411 South Virgil Avenue. The Acura was not registered to that Los Angeles address, but to an address in Van Nuys. The garage had 70 stalls, contained no storage or residential units, and was completely visible from the street through gaps in the building's structural supports. The garage had a moveable vehicle gate that stayed open for about a minute and a half when a car entered. Detectives had previously observed a pedestrian walk into the garage behind a car entering through the vehicle gate.

During prior surveillance, detectives learned that members of the public could directly access the garage through both the unlocked exterior vehicle gate and an unlocked interior door which led to a common area. So on the morning of January 12, Detectives Nee and Raffi walked through the unlocked exterior gate—but discovered that the interior door was locked. The detectives jimmied the door with a "Slim Jim"—in other words, broke into the garage—and entered the parking area. It is undisputed the officers forced entry into the garage without a search warrant.

---

[2] Martinez was charged with the other five defendants in this case. As noted in the lead paragraph, he is not a party to this appeal.

Detective Raffi placed a GPS device on the undercarriage of the Acura.  It is undisputed Raffi had no search warrant authorizing the placing of the GPS device on Castro's car.

Between 8:07 a.m. January 12 and 5:17 p.m. January 13, Los Angeles Police Detectives with the Interstate Theft Task Force remotely tracked the Acura by periodically calling the GPS device and obtaining latitude and longitude coordinates for the vehicle.  At 10:48 a.m. January 13, Detective Nee determined that Castro's Acura was located in Burlingame, California, a city in the San Francisco Bay Area.

About an hour later, Le Lin Huang, a travelling jewelry salesman, was robbed in the parking lot of his Burlingame hotel.  He was robbed at gunpoint by two men who relieved him of a shoulder bag containing about $200,000 in jewelry.  One man was wearing a black hooded sweatshirt, a ski mask, and gloves, and was about five feet, nine inches and 160 pounds.  The other was blond and 25 to 30 years old.  Both men wore gloves.  The robbers fled in a silver four-door sedan—not an SUV—which had paper license plates with black stars.

Later that day, Detective Nee learned of the Huang jewelry robbery, and that the getaway car might be a silver sedan.  The Interstate Theft Task Force detectives continued to track the Acura using the GPS device.  They determined the Acura had left Burlingame and was proceeding southbound on Interstate 5 toward Los Angeles.

At 4:15 p.m. that day, Nee saw the Acura travelling southbound on Interstate 5 in Santa Clarita and began to follow it.  He saw a white Chrysler Town and Country travelling in tandem with the Acura, changing lanes when the Acura did.  The Acura was always in the lead.

Detective Raffi also followed the two vehicles down Interstate 5, for about 30 to 40 minutes.  He drove alongside the Acura and noticed the face of the driver in the following Chrysler Town and County.  Raffi identified the driver as defendant Ortiz-Hernandez.  The license plates of both cars were loosely attached and kept flapping up and down at freeway speeds.  Nee testified the suspects he typically encountered "quite frequently are taking on, removing license plates."

4

The two vehicles left the interstate and were detained by police after attempting to flee police vehicles that were closing in. Defendant Castro was driving the Acura. His passengers were defendants Mojica, Figueroa, and Martinez. Defendant Ortiz-Hernandez was driving the Chrysler. His passenger was defendant Sanchez.

All defendants were arrested on January 13, and both cars were searched incident to those arrests. Officers found a black Puma bag in the Acura containing jewelry stolen in the Burlingame robbery. The bag was on the floorboard, wedged between the second row of seats and the folded down third row of seats.

On January 15, Detective Nee searched both vehicles pursuant to a search warrant. Among other things, he found a cylindrical metal tool in the Acura and a cell phone, two black hooded sweatshirts, and two baseball caps in the Chrysler.

Detective Nee testified the police would not have found the Acura were it not for the GPS device.

All six defendants were jointly charged by felony complaint with three felonies: conspiracy to take personal property from a victim by means of force or fear (Pen. Code, §§ 182, subd. (a)(1), 212.5, subd. (c)), count 1;[3] taking of personal property from a victim with force or fear (§ 212.5, subd. (c)), count 2; and receiving stolen property (§ 496, subd. (a)), count 3.

Prior to the preliminary hearing, defendant Martinez filed a written motion to suppress. Martinez argued the detectives lacked probable cause to detain the Acura and to search it without a warrant. The other defendants joined in the motion and the motion's scope expanded to include the detention and search of both vehicles.

The preliminary hearing proceeded. Evidence of the GPS tracking device was presented in camera because of a claim of official privilege. The Attorney General concedes defendants were initially unaware of the existence of the GPS device when they first argued their motion to suppress to the magistrate. After extensive argument, during which defendants argued the police had observed no behavior establishing probable cause

---

[3] Subsequent statutory citations are to the Penal Code.

5

they had committed any crime, or even a violation of the Vehicle Code, the magistrate initially denied the motion:

"As to the detention of the two vehicles, I overrule or deny the motion to suppress the detention.

"As to the search of the vehicles, I overrule or deny the motion to suppress anything found in the vehicles.

"As to the arrest of the defendants, I find there was probable cause for that purpose. All six. Find the circumstances presented here would justify the arrest of all six. And their search—the search of their persons would not be suppressed as well."

Subsequently, the magistrate released to defendants the evidence taken in camera, finding the official privilege had been waived. Defendants expressly declined to introduce any further evidence, including evidence regarding the GPS device and its placement on the Acura, but asked to re-argue the motion to suppress in light of the release of the in camera evidence. Defendants conceded the magistrate could consider the in camera evidence with regard to the motion to suppress. Defendants did not raise the issue of whether the placement of the GPS device and its use to track the Acura violated the Fourth Amendment. They apparently also failed to explicitly argue that the breaking into the garage constituted a search. The magistrate again denied the motion to suppress.

Defendants were held to answer, and the People filed an information alleging the three offenses set forth in the complaint against all six defendants.

Defendants then filed a new motion to suppress in the superior court.[4] They argued that breaking into the apartment building's garage with a burglary tool and placing the GPS device on the Acura constituted searches under the Fourth Amendment and required either consent or a warrant, both of which were lacking. They further argued they had a reasonable expectation of privacy in the locked garage. Finally,

---

[4] Defendant Castro filed the motion, in which the other defendants joined.

6

defendants re-argued the issue of whether the police had sufficient grounds to detain the two vehicles.

The People opposed the motion. The People first argued that defendants were precluded from raising new legal theories not raised before the magistrate under the decision in *People v. Bennett* (1998) 68 Cal.App.4th 396 (*Bennett*), and thus were limited to the issues of reasonable suspicion to detain the vehicles and probable cause to arrest and search. On the assumption that defendants were precluded from raising the issue of garage entry and the issue of the installation of the GPS device and its use to track defendants, the People argued the evidence before the magistrate showed the defendants were properly detained, arrested with probable cause, and there was probable cause to search the two vehicles.[5]

On the assumption that the superior court would allow defendants to raise the GPS issues, the People argued that no defendant had a reasonable expectation of privacy in the locked garage; the entry into garage, installation of the GPS device on the exterior of the Acura and its use to track the vehicle were not searches and were lawful in any event; and the evidence should not be suppressed because the detectives were acting in good faith given the state of the Fourth Amendment law at the time regarding the installation and use of GPS tracking devices.

In their reply brief, defendants addressed, inter alia, the *Bennett* issue and argued that case did not preclude them from raising new issues in their second motion. In particular, defendants noted the evidence regarding those issues was part of the preliminary hearing transcript and they were not seeking to present new evidence in superior court.

After oral argument, the trial court rendered a detailed ruling. First, the court ruled that *Bennett* did not preclude defendants from raising the GPS issues, because "the evidence of the GPS device was presented at the [preliminary] hearing and is part of the

---

[5] In the course of this opinion, a reference to "the GPS issues" means the entry into the garage, the placement of the GPS device on the Acura, and the use of the device to track the vehicle.

7

preliminary hearing transcript. I believe that their argument can be supported by evidence at the first hearing as shown by the preliminary hearing transcript."

The court then resolved other issues before reaching the one it believed was controlling: the legality of the entry into the garage. First, the court concluded the use of the GPS device was not a search, or at least did not "offend[] the Fourth Amendment . . . . It was in a public place. I think that conduct was reasonable." The court concluded all defendants had standing to contest the vehicle stops and subsequent police conduct "due to any illegality of the entry into the garage." The court relied on *Brendlin v. California* (2007) 551 U.S. 249 (*Brendlin*), which we discuss below. Next, the court concluded "there was probable cause to stop, detain and arrest all defendants," based on the factual findings of the magistrate—and "even if I had to do a complete de novo review." And the court concluded the detective's subjective knowledge of Fourth Amendment law was "irrelevant," and if there was a Fourth Amendment violation "*Leon* would not save it."[6]

With regard to the garage entry, the superior court stated, "if that was illegal I believe the evidence should be suppressed as to all defendants. . . . If there was no expectation of privacy, then the reverse is true." Noting there was no California case directly on point, the superior court found *United States v. Nohara* (9th Cir. 1993) 3 F.3d 1239 (*Nohara*) was persuasive. That case involved common hallways in the defendant's apartment building. The superior court cited a passage in *Nohara* noting, " '[a]n expectation of privacy necessarily implies an expectation that one will be freed of any intrusion, not merely unwarranted intrusion. The common hallways . . . were available for use of residents and their guests, the landlord and his agents, and others having legitimate reasons to be on the premises. That the DEA agent was a technical trespasser in a *common* hallway is of no consequence since appellants had no reasonable expectation that conversations taking place there would be free of intrusion.' " (*Nohara,*

---

[6] This is a reference to *United States v. Leon* (1984) 468 U.S. 897, 922 (*Leon*), which held that the exclusionary rule did not apply when police conduct a search in objectively reasonable reliance on a warrant later found invalid.

*supra,* at p. 1242, quoting *United States v. Eisler* (8th Cir. 1977) 567 F.2d 814, 816 (*Eisler*), original italics.)

Following this reasoning, the superior court noted various factors supporting the conclusion defendants lacked a reasonable expectation of privacy in the apartment building garage:

"The number of parking spaces it had, which was 70. The vehicles could be seen from the outside of the apartment building. There was a car gate which would remain open for about a minute and a half after the gate was activated. Detective Nee saw the pedestrians enter the parking lot through the open car gate. The parking lot did not connect directly to any residential area. There was on one occasion where the pedestrian gate was unlocked when Detective Nee tried to open it. And Detective Nee did not damage the gate."

Noting the issue was "a close call," the superior court concluded "there was no reasonable expectation of privacy, [and] that [the] placing of [the] tracking device was proper . . . ." The court denied the second motion to suppress. Defendants then entered their no contest pleas.

## II. DISCUSSION

Defendants primarily contend the warrantless entry into the apartment garage, and the warrantless installation of the GPS device and its use to track the Acura, constituted a Fourth Amendment violation. For the reasons set forth below, we reject their contentions and affirm.

### A. Standard of Review

A magistrate ruling on a motion to suppress made at the preliminary hearing sits as the finder of fact, resolving credibility issues and conflicts in the evidence, and weighing the evidence and drawing appropriate inferences. (*People v. Shafrir* (2010) 183 Cal.App.4th 1238, 1244 (*Shafrir*).) When the motion to suppress is renewed in superior court, the factual findings of the magistrate are binding on the superior court except to the extent the court allows new evidence. (*People v. Trujillo* (1990) 217 Cal.App.3d 1219, 1223.) In determining a renewed suppression motion, the superior court sits as a

9

reviewing court. (*Ibid.*; cf. *Shafrir, supra,* at pp. 1244–1245 [superior court reviewing magistrate's suppression motion on a section 995 motion bound by magistrate's factual findings and sits as a reviewing court].)

Where, as in this case, the superior court sits as a reviewing court, we as an appellate court review the factual determinations of the magistrate except where new superior court evidence is involved. (See *People v. Ramsey* (1988) 203 Cal.App.3d 671, 679, & fn. 2.) Our review is governed by familiar principles. The magistrate's determinations of fact are governed by the substantial evidence standard of review. The magistrate's selection of the rule of law is a pure question of law, which we review de novo. The magistrate's application of the law to the facts, a mixed question of fact and law, but predominantly a question of law, is likewise subject to de novo review. (*People v. Ayala* (2000) 23 Cal.4th 225, 255 (*Ayala*).) And where, as here, we review legal issues raised for the first time in a renewed motion in superior court but based on facts before the magistrate (see Part II-B, *post*), we exercise our independent review.

### B. Forfeiture

The People renew their procedural objection that defendants have forfeited their right to raise the GPS issues by failing to raise them before the magistrate after the in camera evidence was released. The People again rely on *Bennett*. We conclude the facts of the present case show *Bennett* can be read too broadly, and did not prevent these defendants from raising the GPS issues before the superior court.

Section 1538.5, subdivision (i), allows a felony defendant to make a motion to suppress in the superior court, to be heard at a special hearing. But if the defendant had made a motion to suppress at the preliminary hearing, "evidence presented at the special hearing shall be limited to the transcript of the preliminary hearing and to evidence that could not reasonably have been presented at the preliminary hearing, except that the [P]eople may recall witnesses who testified at the preliminary hearing. . . . The court shall base its ruling on all evidence presented at the special hearing and on the transcript of the preliminary hearing, and the findings of the magistrate shall be binding on the

10

court as to evidence or property not affected by evidence presented at the special hearing." (§ 1538.5, subd. (i).)

*Bennett* interpreted this language in a case presenting the following facts. The defendant's attorney filed a suppression motion at the preliminary hearing, raising three distinct theories. At the time when evidence was presented on the suppression motion, defendant's counsel "never elicited facts relevant to" two of the three grounds, and *expressly disavowed* those two theories. (*Bennett, supra,* 68 Cal.App.4th at p. 399.) The magistrate denied the motion and defendant was held to answer. (*Id.* at p. 400.)

The defendant renewed his suppression motion in superior court, and advanced the same three theories he raised at the preliminary hearing. The People objected that defendant had abandoned two of the three theories at the preliminary hearing. (*Bennett, supra,* 68 Cal.App.4th at p. 400.) The superior court determined that the evidence presented at the preliminary hearing was " 'sparse and inadequate.' " Because it was a serious case involving a potential life sentence, the court allowed a full evidentiary hearing on all three issues, involving evidence not presented at the preliminary hearing. The full evidentiary hearing lasted more than three months. (*Id.* at pp. 400–401, 404.)

The *Bennett* court noted the purpose of section 1538.5, subdivision (i), was to allow a defendant one full evidentiary hearing on his suppression motion―in large part to conserve judicial resources. (*Bennett, supra,* 68 Cal.App.4th at pp. 404–405.) The court quoted the 1991 California Judges Benchbook on search and seizure, which noted " '[a]llowing the parties to shift ground in superior court would seriously undercut the . . . provisions [in section 1538.5] that give binding effect to the magistrate's factual determinations.' " (Cal. Judges Benchbook: Search and Seizure (Cont.Ed.Bar 1991) § 1.55, p. 43, quoted at 68 Cal.App.4th at p. 406.) The court further noted the Benchbook authors noted, in the same section and on the same page, that "if the court permits the raising of new theories, it will be under pressure also to permit new testimony in support of the theories. This would weaken the apparent objective of the [legislative] amendments to get away as much as possible from having two evidentiary hearings." (Quoted at *Bennett, supra,* at p. 406.)

11

The *Bennett* court then concluded that when a defendant makes a motion at the preliminary hearing and renews it in superior court, "it makes no sense to permit a defendant to raise theories at the second hearing which were not litigated at the first. To do so would not only run counter to the usual rule on review, which typically construes a failure to raise an issue in the lower court as a waiver [citations], it would also seriously draw down public resources by necessitating the repeated appearance of law enforcement officers . . . ." The court also concluded that allowing a defendant to raise new theories at the second hearing would violate the purpose of section 1538.5, subdivision (i.) (*Bennett*, *supra*, 68 Cal.App.4th at pp. 406–407.)

*Bennett* is distinguishable on at least two grounds: in that case the defendant expressly waived at the preliminary hearing the new issues raised in superior court; and that case involved new evidence raised in superior court. The present case involves neither situation. All the evidence on the GPS issues was brought before the magistrate and was a part of the preliminary hearing. No new evidence was necessary, so defendants did not get a second bite at the evidentiary apple.[7] And, interestingly, the People themselves addressed the GPS issues, albeit briefly, in a supplemental memorandum of points and authorities filed with the magistrate.

We see no statutory ban on raising new issues based on evidence before the magistrate, at least not under the circumstances of this case. We conclude defendants have not forfeited their challenge to the suppression denial based on those issues.[8]

---

[7] Detective Nee testified briefly at the superior court suppression hearing, apparently with the consent of the People. His testimony tracked his testimony before the magistrate.

[8] To the extent the *Bennett* rationale relies on waiver for failure to raise an issue in the lower court, we find it uncompelling in this case. An appellate court may consider for the first time on appeal a legal issue based on uncontested facts, on which it would exercise independent review—especially where the opposing party, as here, addressed the issue on the merits in the lower court. (See *People v. Mattson* (1990) 50 Cal.3d 826, 854; *People v. Wade* (1996) 48 Cal.App.4th 460, 464.) When the superior court sits as a reviewing court, we would assume the same principles would apply.

## C. Standing

The People contend none of the defendants have standing to raise the issues of the warrantless entry into the garage and the placement of the GPS device on the Acura, because no defendant had a reasonable expectation of privacy in the garage. The People further contend no defendant other than Castro has standing to raise the issue of the installation of the GPS device on Castro's vehicle, because those four defendants lack a possessory or property interest in the Acura. For the reasons set forth below, we find—as did the trial court—that all five defendants have standing to raise the GPS issues.[9]

We review the issue of standing as a question of law, against the factual backdrop of the case. (*People v. Leonard* (1987) 197 Cal.App.3d 235, 239.)

It is well established that Fourth Amendment rights are personal and cannot be asserted vicariously. (*Rakas v. Illinois* (1978) 439 U.S. 128, 133–134 (*Rakas*).) The purpose of the exclusionary rule is to vindicate Fourth Amendment rights; since those rights are personal, only defendants whose rights have been violated may benefit from the rule. (*Rakas, supra,* at pp. 133–134.) A defendant whose Fourth Amendment rights have not been violated, but is aggrieved only by the introduction of evidence seized from another, lacks standing to challenge the search and seizure of that third party's person or property. (*Rakas, supra,* at p. 134; see *United States v. Padilla* (1993) 508 U.S. 77, 81–82.)

Whether or not a given defendant's Fourth Amendment rights have been violated, thus giving him standing to challenge the violation as an unreasonable search, turns on whether the defendant had a reasonable expectation of privacy in the space searched or

---

[9] We are aware our Supreme Court has cautioned against using the term "standing" in Fourth Amendment cases, as opposed to discussing the "inquiry . . . whether the defendant, rather than someone else, had a reasonable expectation of privacy in the place searched or the items seized." (*Ayala, supra,* 23 Cal.4th at p. 254, fn. 3.) But "standing," a term commonly used for some considerable time in Fourth Amendment analyses, does offer a convenient verbal shorthand so long as it is properly understood. (See, e.g., *United States v. Pack* (5th Cir. 2010) 612 F.3d 341, 347 (*Pack*) ["for brevity's sake, courts often refer to the question of whether or not a defendant is asserting a violation of his own Fourth Amendment rights as one of 'standing.' [Citations.]"].)

the item seized.  (*People v. Hernandez* (1988) 199 Cal.App.3d 1182, 1188–1189 (*Hernandez*); see *Rakas, supra,* 439 U.S. at pp. 148–149.)  A reasonable expectation of privacy is defined as (1) a subjective expectation of privacy in the object of the challenged search which (2) society would define as a reasonable expectation. (*California v. Ciraolo* (1986) 476 U.S. 207, 211.)  Factors pertinent to a determination of a reasonable expectation of privacy "include ' "whether the defendant has a [property or] possessory interest in the thing seized or the place searched; whether he has the right to exclude others from that place; whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises." ' [Citations.]" (*Hernandez, supra,* at p. 1189.)

In our view, it is not necessary to delve into the question whether defendants had a reasonable expectation of privacy in the apartment garage for purposes of standing. Under the rationale of *Brendlin*, all defendants have standing to challenge the constitutionality of the traffic stop.

It is true that *Rakas* held a passenger in a vehicle lacked standing to challenge a search of that vehicle when he had no possessory or ownership interest in either the vehicle or the items seized.  (*Rakas, supra,* 439 U.S. at pp. 129–130, 132–140.)  But *Rakas* involved a challenge to a probable cause vehicle *search,* not a challenge to a traffic stop.  (*Id.* at pp. 130–131; see *id.* at pp. 150–151 [conc. opn. of Powell, J.] [passengers did not challenge constitutionality of traffic stop, but only warrantless search of car's interior].)

In contrast, *Brendlin* involved a challenge to the constitutionality of a traffic stop. The stop led to the search of the vehicle and the seizure of evidence.  (*Brendlin, supra,* 551 U.S. at p. 252.)  That case held that a passenger in a car, like the driver, is seized for purposes of the Fourth Amendment because his freedom is restrained or a reasonable person under the circumstances would not feel free to leave.  (*Brendlin, supra,* at pp. 251, 254–259.)  The court made it clear that under the circumstances of a traffic stop the passenger is "seized from the moment [the] car [comes] to a halt on the side of the road

14

. . . ." (*Id.* at p. 263.)  As such, "a passenger is seized as well [as the driver] and so may challenge the constitutionality of the [traffic] stop." (*Id.* at p. 251.)  The passenger could thus argue the evidence seized was tainted by the unconstitutionality of the stop. (*Id.* at pp. 256–259.)

Lower courts have readily followed the *Brendlin* decision "[I]n *Brendlin* . . . , the [c]ourt held that a passenger with no ownership interest in a vehicle could challenge evidence discovered as a result of an allegedly illegal traffic stop of the vehicle, because the stop and the detention that followed constituted a seizure of the persons of everyone in the vehicle.  [Citation.]  Since everyone in the vehicle was seized, the passenger's challenge was directed against a purported violation of his own Fourth Amendment rights.  [Citation.]" (*Pack, supra,* 612 F.3d at p. 348; accord, *United States v. Diaz-Castaneda* (9th Cir. 2007) 494 F.3d 1146, 1150 [passenger has standing to challenge constitutionality of traffic stop]; *United States v. Twilley* (9th. Cir. 2000) 222 F.3d 1092, 1095 [passenger has no standing to challenge a search of a vehicle per se, but "may challenge a stop of a vehicle on Fourth Amendment grounds even if she has no possessory or ownership interest in the vehicle"].)

Here the installation of the GPS device, and its use to monitor and track the Acura's movements, were the means essential to the locating and detaining of the Acura, the Chrysler, and the occupants—both drivers and passengers—of both vehicles.  The evidence is clear that without the GPS device the vehicle would not have been located and stopped.  Therefore, it stands to reason that if the installation and use of the GPS device constitutes a search, defendants have standing to challenge the constitutionality of that search because the GPS was instrumental in their detention.  And if the traffic stop was unconstitutional, any evidence seized as a result of the stop would be tainted by that unconstitutionality and should be suppressed.

" 'If either the stopping of the car, the length of the passenger's detention thereafter, or the passenger's removal from it are unreasonable in a Fourth Amendment sense, then surely the passenger has standing to object to those constitutional violations *and to have suppressed any evidence found in the car which is their fruit*' . . . ."

15

(*Brendlin, supra,* 551 U.S. at p. 259, quoting 6 LaFave, Search and Seizure (4th ed. 2004 and Supp. 2007) § 11.3(e), pp. 194, 195 & n. 277, fn. omitted, italics added by this court.) In *United States v. Ellis* (6th Cir. 2007) 497 F.3d 606 (*Ellis*), the court essentially harmonized *Rakas* and cognate cases, both pre- and post-*Brendlin*, by distinguishing between a direct challenge to a vehicle search by a passenger with no property or possessory interest in the vehicle, and a challenge to a traffic stop and the subsequent suppression of evidence found in a subsequent vehicle search tainted by an unconstitutional stop. (*Ellis, supra,* at p. 612; see *United States v. Jones* (D.C. Cir. 2005) 374 F.Supp.2d 143, 154.)

We note that in their supplemental memorandum filed below, the People *conceded* the standing issue regarding the traffic stop: "The People concede that all defendants, as drivers and as passengers, have the right to challenge their detentions in the Acura and Chrysler, respectively, on 1/13/10 (*Brendlin*[*, supra,*] 551 U.S. 249)." Accordingly, all defendants would have standing to seek suppression of the evidence seized from the two vehicles as the fruit of an unconstitutional detention based on the installation and use of the GPS device.

But the People now argue on appeal, at least regarding all defendants other than Castro, that *Brendlin* "provides to a passenger" standing to "protest the reasonableness of the stop itself," but not "standing at points previous in the timeline to the stop." This is a narrow reading of *Brendlin* and a crabbed approach to logic. Fourth Amendment reasonableness is not always subject to neat temporal compartmentalization. If the installation and use of the GPS was constitutionally unreasonable, it would of course taint the vehicle stops and any evidence seized as a result. Events antecedent to a traffic stop are generally pertinent to a determination of constitutional reasonableness.[10]

---

[10] The People rely on several cases which are inapposite. In *United States v. Crippen* (8th Cir. 2010) 627 F.3d 1056, 1063, the defendant challenged the search of the vehicle in which he was a passenger―but did *not* challenge the traffic stop. In *United States v. Moody* (5th Cir. 2009) 564 F.3d 754, 761–762, a defendant tried to apply the *Brendlin* ruling to the search of a home, not a vehicle. In *United States v. Soriano-Jarquin* (4th Cir. 2007) 492 F.3d 495, 499–500, the defendant did not challenge the

We conclude all defendants have standing to raise the GPS issues.

### D. The Merits

On January 23, 2012, subsequent to the installation and use of the GPS device in the present case, the United States Supreme Court held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.' " (*United States v. Jones* (2012) ___ U.S. ___, 181 L.Ed.2d 911, 918 (*Jones*), fn. omitted.)  The court upheld the District of Columbia Court of Appeal's determination that installation and use of a GPS device without a warrant violated the Fourth Amendment.  (*Jones, supra,* at pp. 917, 923.)

We need not discuss *Jones*'s Fourth Amendment analysis.  The present case turns on whether the officers who installed and used the GPS device on Castro's Acura were acting on an objective good faith reliance on existing binding precedent holding such actions did not constitute a Fourth Amendment violation.  We conclude that they were so acting, and suppression of the seized evidence is unwarranted.

In *Davis v. United States* (2011) ___ U.S. ___, 180 L.Ed.2d 285 (*Davis*), the court held that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule."  (*Davis, supra,* at p. 290.)  The court confirmed that the exclusionary rule was "a 'judicially created remedy' of this [c]ourt's own making.  [Citation.]"  (*Id.* at p. 294.)  The court also stressed the rule was designed to deter future Fourth Amendment violations which generally result from deliberate, reckless or grossly negligent disregard of Fourth Amendment rights.  (*Davis, supra,* at pp. 293–295.)

In that vein, the court noted it had previously held that under certain circumstances involving the good faith conduct of law enforcement agents, the exclusionary rule would not apply.  (*Davis, supra,* 180 L.Ed.2d at p. 295, citing *Leon, supra,* 468 U.S. at p. 922

---

traffic stop, but only a request for identification during the stop.  And in *State v. Gilbert* (Kan. 2011) 254 P.3d 1271, 1271–1275, the defendant was a passenger in a parked car, and was arrested on an outstanding warrant.  The car, which he had no property or possessory interest, was then searched.

[exclusionary rule does not apply when officers conduct search in objectively reasonable reliance on a warrant later held invalid]; *Illinois v. Krull* (1987) 480 U.S. 340, 349–350 [same result when officers conduct search in reasonable reliance on statutes which are subsequently invalidated]; *Arizona v. Evans* (1995) 514 U.S. 1, 14 (*Evans*) [same result when police reasonably rely on erroneous information regarding an arrest warrant in a database maintained by judicial employees]; *Herring v. United States* (2009) 555 U.S. 135, 137, 144 [*Evans* extended to erroneous information in a database maintained by police employees].)  The theme of these cases is simple:  the error did not rest with the officer acting on the warrant, statute, or database information—thus the deterrent value of the exclusionary rule did not come into play.  (*Davis, supra,* at p. 295.)

Under *Davis*, the officers in the present case are not subject to the exclusionary rule if they acted in objectively reasonable reliance on binding appellate precedent authorizing the warrantless installation and use of a GPS device on an automobile.

There was such precedent.  In *People v. Zichwic* (2001) 94 Cal.App.4th 944 (*Zichwic*), police officers attached an electronic monitoring device to the undercarriage of defendant's truck while it was parked in his driveway.  They used the device to monitor the truck's movements, and tracked defendant to a PG&E yard where he was caught in the act of a burglary.  (*Zichwic, supra,* at pp. 948–950.)  Defendant was on parole and subject to a standard search condition.  (*Id.* at p. 951.)  The Sixth District first held that "if we assume that attaching an electronic tracking device to the undercarriage of defendant's truck constituted a search, it was authorized by defendant's parole search condition[]" because it was reasonable, and not arbitrary, capricious, or harassing under the standard set forth in *People v. Reyes* (1998) 19 Cal.4th 743, 752.  (*Zichwic, supra,* at p. 953.)

The *Zichwic* court then held as follows:  "If defendant was not subject to a parole search condition, we would conclude, on the record before us, that installing an electronic tracking device on the undercarriage of defendant's truck did not amount to a search within the meaning of the Fourth Amendment."  (*Zichwic, supra,* 94 Cal.App.4th at p. 953.)  The court observed that the defendant had no reasonable expectation of privacy in

18

his driveway, despite the fact that it may have been within the curtilage of his home, because it was accessible and visible from a public street—even if the officers trespassed into the curtilage to plant the device. (*Id.* at pp. 953–954; see *id.* at pp. 949–950.) The court also observed the defendant had no reasonable expectation of privacy in the undercarriage of his truck, because it was part of the vehicle's exterior. The court cited with approval the reasoning of *U.S. v. McIver* (9th Cir. 1999) 186 F.3d 1119, 1127.[11] (*Zichwic, supra,* at pp. 954–956.) The *Zichwic* court concluded: "While the undercarriage of a vehicle is not as readily seen as the hood, doors, and other parts of its exterior, the undercarriage is part of the exterior that is ordinarily exposed to public view. It does not amount to a search to examine the undercarriage, to touch it, or to attach a tracking device, so long as a police officer does so *from a place where the officer has a right to be.*" (*Id.* at p. 956, italics added.)

The *Zichwic* court also noted defendant challenged only the installation of the device, not its use to track his movements, but that "[t]he United States Supreme Court has concluded that monitoring electronic signals does not amount to a search when the only information provided is what could be obtained through visual surveillance, such as the movements of an automobile on public thoroughfares. [Citation.] Monitoring does amount to a search when it reveals information about otherwise hidden activities inside a residence. [Citation.]" (*Zichwic, supra,* 94 Cal.App.4th at p. 956.)

In the quoted passage, the *Zichwic* court cited *United States v. Knotts* (1983) 460 U.S. 276, 281–282 (*Knotts*), and *United States v. Karo* (1984) 468 U.S. 705, 715 (*Karo*), respectively. In *Knotts,* a beeper was placed in a can of chloroform in cooperation with law enforcement. The can was later sold to the defendant and the beeper inside was used to trace his movements. (*Knotts, supra,* at pp. 277–279.) The United States Supreme Court held *there was no expectation of privacy in vehicle movements on a public thoroughfare.* (*Id.* at pp. 281–282, 285.) In *Karo,* a beeper was placed in a can of ether,

---

[11] In *United States v. Pineda-Moreno* (9th Cir. 2012) 688 F.3d 1087, 1091, the Ninth Circuit noted *United States v. McIver, supra,* 186 F.3d 1119 was "at least partially overrule[d]" by *Jones, supra,* 181 L.Ed.2d 911.

19

also in cooperation with law enforcement. (*Karo, supra,* at pp. 708–710.) The court held it violated the Fourth Amendment to monitor the beeper *inside a private residence* without a warrant. (*Karo, supra,* at pp. 714–715.)

The *Zichwic* court then concluded: "*For all the reasons above*, we conclude that the trial court did not err in denying defendant's suppression motion." (*Zichwic, supra,* 94 Cal.App.4th at p. 956, italics added.)

The record shows the officers in the present case reasonably relied on binding precedent. While not mentioning *Zichwic* specifically, Officer Nee testified at the superior court suppression hearing that he "attempted to remain current with the law on the subject of Fourth Amendment rights and the use of electronic [trackers] for surveillance." He noted the Los Angeles Police Department, the Los Angeles County and Orange County District Attorneys' Offices, and the Department of Homeland Security periodically published training bulletins and legal briefs for law enforcement personnel, which include the subject of premises entry for the purpose of attaching electronic trackers for surveillance. The superior court believed that Officer Nee's knowledge of Fourth Amendment law to be irrelevant—this is a question of law on which we respectfully disagree.

Defendants argue the *Zichwic* decision cannot be binding precedent for three reasons. First, they contend the Fourth Amendment analysis in *Zichwic* presupposing the absence of a parole search condition is merely dicta. We disagree. As we read the opinion, the language is an alternative holding. "It is well settled that where two independent reasons are given for a decision, neither one is to be considered mere *dictum*, since there is no more reason for calling one ground the real basis of the decision than the other. The ruling on both grounds is the judgment of the court and each is of equal validity." (*Bank of Italy etc. Assn. v. Bentley* (1933) 217 Cal. 644, 650; see 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 512, pp. 577–578.) The *Zichwic* decision devotes considerable attention to both grounds discussed, and explicitly refers to *both* the search condition analysis and the "pure" Fourth Amendment analysis as the basis for its ultimate conclusion: "*For all the reasons above*, we conclude that the trial court did not

20

err in denying defendant's suppression motion." (*Zichwic, supra,* 94 Cal.App.4th at p. 956, italics added.)

Second, defendants argue the GPS used in this case presents a qualitatively more severe intrusion into privacy than the beeper used in *Zichwic*. (The *Zichwic* opinion consistently refers to an "electronic tracking device," but there is at least one reference to a "beeper." [*Zichwic, supra,* 94 Cal.App.4th at p. 950.]) They refer to a passage from the lower appellate court opinion in *Jones*, which described GPS technology as "a heretofore unknown type of intrusion into an ordinarily and hitherto private enclave." (*United States v. Maynard* (D.C. Cir. 2010) 615 F.3d 544, 565 (*Maynard*), affd. sub nom. *Jones, supra,* 181 L.Ed.2d 911.) But the passage refers to the intrusion caused by intensive, long-term surveillance of private lives and private movements using GPS technology. (*Maynard, supra,* at pp. 561–565.) For purposes of basic Fourth Amendment analysis, the relatively short-term surveillance employed in *Zichwic* and the present case are virtually indistinguishable. The officers in the case before us were entitled to believe it was not unconstitutional to attach a GPS to the undercarriage of Castro's Acura and use it to monitor his movements for a period of approximately 33 hours.

Finally, defendants argue *Zichwic* is not binding precedent because in the present case the officers did not install the GPS device from a place where they had a right to be. Defendants stress that the officers essentially broke into the apartment garage and did not ask the manager for permission to enter. But, as the trial court found, defendants did not have a reasonable expectation of privacy that the garage would be free from government intrusion. Common areas of apartment buildings, including garages, are generally not cloaked in a reasonable expectation of privacy. (See, e.g., *People v. Terry* (1969) 70 Cal.2d 410, 427; *Cowing v. City of Torrance* (1976) 60 Cal.App.3d 757, 763 (*Cowing*).) This is true even if the common areas are locked. (See, e.g., *Cowing, supra,* at pp. 762–763; *United States v. Correa* (3d Cir. 2011) 653 F.3d 187, 190–191 (*Correa*); *United*

*States v. Barrios-Moriera* (2d Cir. 1989) 872 F.2d 12, 14.)[12] The locks are designed for the security of occupants, not to provide a reasonable expectation of privacy in common areas. (See *Eisler, supra,* 567 F.2d at p. 816; see also *Correa, supra,* at pp. 190–191.) And a reasonable expectation of privacy does not turn on the question whether law enforcement trespassed on the common areas. (*Correa, supra,* at p. 191; *Nohara, supra,* 3 F.3d at p. 1242.)[13]

We are bound by, and agree with, the factual findings of the superior court when it listed the factors showing a lack of a reasonable expectation of privacy in the garage: "The number of parking spaces it had, which was 70. The vehicles could be seen from the outside of the apartment building. There was a car gate which would remain open for about a minute and a half after the gate was activated. Detective Nee saw the pedestrians enter the parking lot through the open car gate. The parking lot did not connect directly to any residential area. There was on one occasion where the pedestrian gate was unlocked when Detective Nee tried to open it. And Detective Nee did not damage the gate."

We would add the obvious inference that, assuming full occupancy of the apartment building, the 70-space garage was accessed by at least 69 other people―and quite possibly two to three times that much, accounting for families, significant others, and visiting friends―all of whose comings and goings were visible from the street. Defendants simply had no reasonable expectation of privacy in the garage, anymore than

---

[12] We are aware that *United States v. Carriger* (6th Cir. 1976) 541 F.2d 545, 549–552, is to the contrary. We find the position of the decisions we have cited in the text to be more persuasive.

[13] The only case we have found where police officers actually broke into a locked residence is *McDonald v. United States* (1948) 335 U.S. 451. The court suppressed the evidence, but it appears the officers pried open a window into a bedroom―not shimmied open a locked door into a common area. (See *Id.* at pp. 458–459 [conc. opn. of Jackson, J.].) The opinion is factually distinguishable from the case before us, and predates the accepted body of jurisprudence establishing a lack of a reasonable expectation of privacy in common areas. And if defendants had no reasonable expectation of privacy in the apartment garage, we do not believe the officers' trespass amounted to a violation of the Fourth Amendment.

they would if the Acura were parked in a private driveway visible from the public thoroughfare.

We therefore conclude the officers in this case were acting in reasonable reliance on binding appellate precedent—*Zichwic* and *Knotts*—authorizing their actions in installing the GPS device and using it to monitor the Acura's movements.[14]

Finally, we conclude the officers had probable cause to arrest defendants after they detained their two vehicles. Probable cause to arrest exists "if facts known to the arresting officers would lead a person of ordinary care and prudence to entertain an honest and strong suspicion that an individual is guilty of a crime." (*People v. Kraft* (2000) 23 Cal.4th 978, 1037.) Here, the officers had conducted surveillance of defendants Martinez, Mojica, and Ortiz-Hernandez and of the Acura, and had seen several defendants and the occupants of the Acura casing jewelry stores. This was consistent with the behavior of Los Angeles jewelry theft gangs. A robbery involving a silver Acura was reported at one of the areas where the defendants had been casing. The Acura was in Burlingame close to the time of the Huang jewelry robbery, and left Burlingame for Los Angeles driving in tandem with the Chrysler driven by Ortiz-Hernandez. The license plates of both vehicles were loosely attached, and presumably could be easily removed. Given the officers' expertise with the behaviors of jewelry theft gangs, and these observable facts, we agree with the magistrate and the superior court that the officers had sufficient probable cause for the arrest of defendants—and to search the vehicles incident to those arrests. "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." (*United States v. Ross* 1982) 456 U.S. 798, 825; see *Chambers v. Maroney* (1970) 399 U.S. 42, 48–52.)[15]

---

[14] We therefore reject the arguments of some defendants that the traffic stop of their two vehicles was unconstitutional because it was tainted by the unconstitutional installation and use of the GPS device to find the Acura.

[15] In light of our conclusion based on these authorities we need not address any issues raised by *Arizona v. Gant* (2009) 556 U.S. 332.

In light of the foregoing, the motion to suppress evidence in superior court was properly denied.

## III.  DISPOSITION

The judgments are affirmed.

_____
Margulies, Acting P.J.

We concur:

_____
Dondero, J.

_____
Banke, J.